ASSOCIATED INDEMNITY CORPORA-TION and Fireman's Fund Insurance Company, Petitioners,

v.

CAT CONTRACTING, INC., GTS Equipment, Inc., Michigan Sewer Construction Co., Construction Equipment Co., Mario Diponio, Benjamin Diponio, Phyllis Diponio, Guilio Catallo, and Rosemary Catallo, Respondents.

No. 96–0387.

Supreme Court of Texas.

Argued Oct. 8, 1997.

Decided Feb. 13, 1998.

Rehearing Overruled May 8, 1998.

Joseph A. Rodriguez, Brownsville, Jeffrey Parsons, Tracy Phillips, Houston, James A. Knox, Dallas, for Petitioners.

Roger W. Hughes, Harlingen, David E. Keltner, Fort Worth, Edward A. Stapleton, III, Brownsville, Tom Lockhart, Harlingen, for Respondents.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, ENOCH, SPECTOR, BAKER, ABBOTT and HANKINSON, Justices, join.

The primary issue presented is whether at common law a surety owes a duty of good faith to its principal. The court of appeals, holding that this duty existed, affirmed the trial court's judgment for the principal against its surety for bad faith conduct. 918 S.W.2d 580. For the reasons set forth below, we hold that a surety does not owe a common law duty of good faith to its principal. However, we further hold that because there is some evidence to support the trial court's finding that the surety in this case did not satisfy the contractual condition of good faith under the parties' indemnity agreement, the surety is not entitled to indemnification under that agreement. Finally, we hold that the court of appeals correctly rejected the principal's claims that the surety violated the Deceptive Trade Practices Act and breached an informal fiduciary duty. We therefore reverse the judgment of the court of appeals in part and affirm in part, rendering judgment that all parties take nothing.

## I.  Facts and Procedural Background

In 1988, CAT Contracting, Inc. and Michigan Sewer Construction Company (collectively "Contractor") agreed to construct eight miles of concrete pipeline for the Cameron County Fresh Water Supply District No. 1 ("Owner"). As required by the contract and by statute, *see* TEX. GOV'T CODE § 2253.021(a),(d); TEX. LOC. GOV'T CODE § 252.044(a), Contractor secured bonding to guarantee its obligations under the contract. Associated Indemnity Corporation ("Surety") issued performance and payment bonds naming Owner as obligee; in return, Contractor agreed to indemnify Surety for any losses Surety incurred under the bonds. The indemnity agreement was signed by Guilio Catallo, individually and as president of CAT, and by Mario Diponio, individually and as vice-president of Michigan, along with their respective spouses, business partners and a related corporate entity. (When the context requires, "Contractor" includes these additional parties to the indemnity agreement.)

The indemnity agreement vested Surety with exclusive authority to determine whether any claim under the bonds should be settled, and for how much. It further provided that Surety's decision to settle a claim, if "made in good faith," was binding on Contractor, triggering Contractor's obligation to reimburse Surety for the settlement amount. Finally, the agreement provided that Contractor's default of the construction contract would constitute an assignment to Surety of Contractor's claims, if any, against Owner as "collateral security" for Contractor's indemnity obligation.

Shortly after Contractor began construction, it became concerned that the soil conditions were too unstable for concrete pipeline.

This instability could cause the concrete pipe to rupture when it settled. Contractor expressed these concerns to Owner, which under the contract bore the responsibility for any design errors. Owner's engineers assured Contractor that the design was sound, and ordered Contractor to continue with construction.

After Contractor installed the pipeline, a pressure test revealed fourteen leaks. Contending that Owner's design caused the leaks, Contractor demanded additional payments to make repairs. Owner denied any fault, instead blaming the leaks on Contractor's installation. After Contractor still refused to make repairs, Owner declared the contract in default and called on Surety to complete the work under its performance bond.

Surety assigned its employee, Steve Mollenhauer, who is both a lawyer and a civil engineer, to investigate the dispute. After Mollenhauer met separately with representatives of Contractor and Owner, Surety agreed with Owner to repair the fourteen existing leaks, reserving the parties' rights regarding ultimate liability for the repairs. Surety expressly recognized at that time that its investigation was ongoing and thus far "inconclusive." Mollenhauer testified that Surety agreed to perform the repairs immediately to mitigate damages and to expedite its investigation, as repairs would necessarily require excavation around the leaks.

After notifying Contractor of its decision to perform repairs, Surety retained a local contracting company, Mercer & Ussery, to conduct the work. Mercer, a competitor of Contractor, had earlier installed a different section of the same pipeline. Surety agreed to compensate Mercer on a "time and materials" basis, paying Mercer costs plus fifteen percent, without any predetermined limit. Mercer completed the repairs in February 1991, billing Surety over $242,000.

Lee Wolz, a construction consultant whom Surety hired to assist in its investigation, monitored the repair operations and examined the leaks. Wolz wrote to Mollenhauer on February 15, 1991, that unstable soil conditions made it "next to impossible to restrain the pipe while it is being laid over a long distance," so that Owner's design may have created an "impossible spec to achieve." Wolz, who had extensive construction experience but was not an engineer, recommended that Mollenhauer consult with an engineering firm to investigate the design issue. Mollenhauer did not do so.

A pressure test performed after Mercer completed its repairs revealed twelve more leaks. Contractor's representatives, continuing to blame the leaks on the pipeline design, once again met with Mollenhauer in April 1991. Maury Stiver, an engineer retained by Contractor to substantiate its design flaw claim, presented his report to Mollenhauer at the meeting. Mollenhauer testified that he was not satisfied with Stiver's report because Stiver had not visited the pipeline to inspect the leaks. However, Mario Diponio, Michigan's vice-president, testified that Mollenhauer or some other Surety representative told him at the meeting that there was a "good case" that Owner's engineers were at fault, and that Surety would notify Contractor before making any final decision to settle Owner's claim.

Shortly thereafter, without notice to Contractor, Surety settled with Owner. Surety paid Owner $380,000 in full settlement of Owner's claims under the bonds. Also, Surety released any claims it might have had against Owner arising from the transaction, including any rights to contract funds Owner still owed to Contractor. The settlement agreement, however, did not purport to affect Contractor's right to pursue contract claims against Owner.[1] Contractor claims that, at that time, Owner owed it $425,000 under the construction contract.

---

1. The settlement agreement provided that "Surety *for itself only,* agrees to release and relinquish any and all rights it may have under the contract or performance bond with respect to [retainage funds held by the Owner]," and also that "Surety further agrees to release, acquit and forever discharge, *for itself only,* [Owner] from any and all causes of action, claims, damages, demands and expenses, which Surety now has or may hereafter acquire [arising out of the performance bond or construction contract]." (emphasis added).

After settling with Owner, Surety demanded $835,000 as indemnity from Contractor, including the $380,000 settlement payment, repair costs, and other alleged incidental expenses. When Contractor refused to pay, Surety brought this suit. Contractor counterclaimed against Surety for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, Deceptive Trade Practices Act and Texas Insurance Code violations, fraud, tortious interference with contract, and negligent misrepresentation. ·Contractor claimed that Surety failed to keep it informed, failed to adequately investigate and assert Contractor's claim of design error, and failed to protect Contractor's interests during the settlement process.

After a nonjury trial, the trial court ruled that the DTPA did not apply to the transaction. However, the trial court found that Surety had breached a common law duty of good faith and fair dealing, breached the indemnity agreement by failing to act in good faith, breached a fiduciary duty owed to Contractor, violated article 21.21 of the Insurance Code, and committed fraud, tortious interference with contract, and negligent misrepresentation. The trial court rendered judgment denying Surety indemnity and awarding CAT and Michigan $4,163,305 in lost profits and $425,579 under the construction contract, and the principals and their spouses $700,000 in mental anguish damages.

The court of appeals affirmed in part, holding that Contractor was entitled to recover for Surety's breach of both a common law and contractual duty of good faith. However, the court of appeals reduced Contractor's lost profits award to $406,506 and the principals' mental anguish award to $600,000. It also held that Surety owed no fiduciary duty to Contractor, that article 21.21 of the Insurance Code did not apply to the suretyship relationship, and that, while there was evidence that Surety committed a deceptive act under the DTPA, that conduct was not the producing cause of any damages to Contractor. Finally, the court affirmed the take-nothing judgment against Surety on its indemnity claim. In light of these holdings, it did not reach the issues of fraud, tortious interference with contract, or negligent mis-

representation. Both sides filed applications for writ of error.

## II.   Duty of Good Faith
### A.

■ Contractor argues that a bond surety owes its principal a common law duty of good faith and fair dealing. We recently examined the tripartite relationship between bond surety, principal, and obligee in *Great American Insurance Co. v. North Austin Municipal Utility District No. 1*, 908 S.W.2d 415 (Tex.1995). The issue in *Great American* was whether a bond surety owes a common law duty of good faith to the *obligee*. In holding that no such duty exists, we reaffirmed that not every contractual relationship gives rise to a duty of good faith. *See* 908 S.W.2d at 418 (citing *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983)); *see also Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 594 (Tex.1992). Instead, this Court has imposed such a duty only for certain special relationships, such as that between an insurer and its insured. *See Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). We considered the following factors in *Arnold* to find such a special relationship:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Id.* We concluded in *Great American* that because these factors are not present in the relationship between surety and obligee, the duty of good faith and fair dealing should not apply. *See* 908 S.W.2d at 418–20. Because we likewise conclude that they are not present in the relationship between surety and principal, we also decline to extend the duty to this relationship.

Regarding unequal bargaining position, Contractor argues that Surety completely dictated the terms of the indemnity agreement. Contractor contends that sureties enjoy a "sellers' market" in which they can promulgate form indemnity agreements on a take-it-or-leave-it basis. Because contractors must obtain bonding to perform governmental contracts, they have no choice but to accept the sureties' terms.

While Contractor may not have had the ability to negotiate specific terms of its indemnity agreement, this by itself does not justify imposing a special duty. The principal terms of the indemnity agreement at issue here are standard throughout the industry, and have been widely upheld by courts. *See, e.g., Hess v. American States Ins. Co.,* 589 S.W.2d 548, 550–51 (Tex.Civ. App.—Amarillo 1979, no writ); *Ford v. Aetna Ins. Co.,* 394 S.W.2d 693, 696 n. 1 (Tex. Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.); *Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 and n. 5 (4th Cir.1983); *Commercial Ins. Co. v. Pacific–Peru Constr. Corp.,* 558 F.2d 948, 953 (9th Cir.1977); *Transamerica Ins. Co. v. Bloomfield,* 401 F.2d 357, 359 n. 1, 362–63 (6th Cir.1968); *Engbrock v. Federal Ins. Co.,* 370 F.2d 784, 786 (5th Cir.1967); *Fidelity & Deposit Co. v. Whitson,* 187 Cal.App.2d 751, 10 Cal.Rptr. 6, 9–10 (1961); *United States Fidelity & Guar. Co. v. Napier Elec. & Constr. Co.,* 571 S.W.2d 644, 645–46 (Ky.Ct. App.1978); *Fidelity & Deposit Co. v. Thieme,* 193 So. 496, 497–98 (La.App.1940). *See also* Hinchey, *Surety's Performance over Protest of Principal: Considerations and Risks,* 22 Tort & Ins. L.J. 133, 142–48 (1986). This type of indemnity agreement is critical in enabling sureties to perform efficiently.[2]

Importantly, bond principals are not faced with the bargaining disadvantage *during the claims resolution process* that underscored the special duty in *Arnold.* Contractor, unlike the typical insured discussed in *Arnold,* is a construction company with considerable business sophistication. Moreover, unlike in the insurance context, the indemnity agreement itself provides considerable protection to the principal. Under the express terms of the agreement, Surety has a right of indemnity only for settlement amounts paid in "good faith." This condition, like others in the agreement before us, is standard. *See* Hinchey, 22 Tort & Ins. L.J. at 143.[3] Thus, the indemnity agreement itself provides strong financial incentive for sureties to exercise good faith in evaluating and settling claims. This Court has specifically recognized that "[t]he expense, delay, trouble, and risk of loss to the guarantee company is a sufficient safeguard against an unwarranted payment." *Central Surety & Ins. Corp. v. Martin,* 224 S.W.2d 773, 777 (Tex.Civ.App.— Beaumont 1949, writ ref'd).

We stated in *Arnold* that, because the insurer has exclusive control over the processing of claims, an insurer could "arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed." 725 S.W.2d at 167. Because the principal does not look to the surety for protection against loss, this factor also does not apply to the suretyship relationship.

Apart from the *Arnold* factors, other policy considerations not present in the insurance context weigh against imposing a special duty in this case. Under the tripartite suretyship relationship, a bond surety is of-

**2.** Courts have long recognized that a surety has an equitable right to reimbursement from the principal for amounts paid on an indemnity bond. To recover against the principal under this equitable remedy, however, many jurisdictions required the surety to prove that the principal was in fact liable on the claim. With only this remedy available, many sureties were reluctant to settle claims prior to a determination of the principal's liability. This dilemma led to widespread use of the type of indemnity agreement at issue here, under which the surety may obtain reimbursement for settlement amounts paid in good faith, regardless of whether the principal is ultimately determined to be liable to

the obligee. The indemnity agreement thus encourages settlement of claims, avoiding expensive and time-consuming litigation, generally without unfairness. *See generally* Hinchey, 22 Tort & Ins. L.J. at 141–43.

**3.** Some courts have held that a surety can never recover indemnity from its principal without exercising good faith, whether or not the terms of the indemnity agreement impose this condition. *See, e.g., Hartford v. Tanner,* 22 Kan.App.2d 64, 910 P.2d 872, 878–80 (1996). We express no opinion on this issue.

ten called upon to balance the claims of an obligee under a performance bond against the protests of the principal that it did not in fact default. This has sometimes been called the surety's "classic dilemma." *See* Hinchey, 22 TORT & INS. L.J. at 133; Klinger & Diwick, *Dispute Between the Obligee and Principal, in* THE LAW OF SURETYSHIP 8–1 (Gallagher ed., 1993). In *Great American,* we refused to impose a duty of good faith in obligee's favor because it would upset this balance. Just as a surety might be reluctant to assert legitimate defenses on the principal's behalf against the obligee's claim if such a duty were imposed, *see Great American,* 908 S.W.2d at 419, so a surety might be reluctant to satisfy an obligee's valid claims under a performance bond (even though such a bond exists for the benefit of the obligee) for fear of incurring tort liability to the principal.

## B.

Under the indemnity agreement, Contractor conditionally assigned to Surety any contractual claims it might have had against Owner as collateral security for Contractor's indemnity obligation. This provision, Contractor argues, vested Surety with the right to settle fully Contractor's counterclaims against Owner. A duty of good faith is required, according to Contractor, to prevent a surety from abusing this power. Under Contractor's theory, for example, an unscrupulous surety could simply release the principal's valid counterclaim against the obligee in exchange for release of the obligee's meritless claim under the bond. The good faith requirement for indemnity would not apply, since the surety has contributed no cash to the settlement and thus need not seek indemnity from the principal.

This argument does not justify imposing a common law duty of good faith on sureties. Existing commercial law duties prohibit a surety from disposing of collateral—including causes of action—in a commercially unreasonable manner. *See* TEX. BUS. & COM.CODE § 9.102(a), 9.106 (provisions of Uniform Commercial Code article 9 apply to a security

interest in "general intangibles," including "things in action"); *id.* § 9.207(a) (secured party must use reasonable care to protect collateral); *id.* § 9.504(c) (secured party must dispose of collateral in a commercially reasonable manner). Because of these protections, no independent duty of good faith is warranted.[4]

Those jurisdictions recognizing an affirmative duty of good faith in surety contracts have generally done so either because they impose such duty in all contracts, *see City of Portland v. George D. Ward & Assocs.,* 89 Or.App. 452, 750 P.2d 171, 174 (1988), or because they equate suretyship with the business of insurance, *see Windowmaster Corp. v. Morse/Diesel, Inc.,* 722 F.Supp. 1532, 1534–35 (N.D.Ill.1988); *Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.,* 797 P.2d 622, 626–27 (Alaska 1990); *Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 778 P.2d 1240, 1241–42 (1989); *Tonkin v. Bob Eldridge Constr. Co.,* 808 S.W.2d 849, 854 (Mo.Ct.App.1991). We do not impose a duty of good faith in all contracts, *see English,* 660 S.W.2d at 522, and we have concluded that suretyship and insurance are fundamentally different. *See Great American,* 908 S.W.2d at 420–24. Therefore, we hold that a bond surety does not owe a common law duty of good faith to its principal.

## III. Indemnification
### A.

Surety argues that Contractor should indemnify it for the amount it paid for repairs and to settle Owner's claim. The indemnity agreement vests Surety with the right to obtain reimbursement from Contractor for amounts Surety pays "in good faith." Finding that "Surety acted in bad faith in investigating and settling the claims with Owner," the trial court rendered judgment denying Surety indemnity under the contract, which the court of appeals affirmed. Surety argues that there is no evidence to support the trial court's finding of bad faith.

---

4. We reiterate that the settlement agreement between Surety and Owner in this case did not purport to release Contractor's claims against the Owner. *See supra* note 1 and accompanying text. We express no opinion on whether the indemnity agreement at issue here would have allowed Surety to release these claims without any further action from Contractor.

Both the trial court and Surety appear to have equated "bad faith" with lack of "good faith" under the agreement. While this is conceptually sound, *see, e.g., Fidelity & Deposit Co. v. Wu*, 150 Vt. 225, 552 A.2d 1196, 1199 n. 4 (1988) ("bad faith" and "lack of good faith" may be used interchangeably), it potentially obscures the burden of proof on the good faith issue. Before addressing Surety's evidentiary challenge, therefore, we first discuss the burden of proof, as well as the appropriate definition of "good faith" under these circumstances.

■ The indemnity agreement provides:
The Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against the Surety or the Indemnitors or any one of them on any such Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision thereon, if made in good faith, shall be final and binding on the Indemnitors.

This language requires Surety to exercise good faith in settling claims to be entitled to reimbursement from Contractor for the payments. Thus, good faith is a condition precedent to Surety's right of indemnity. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex.1992) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation."); *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex.1990) (terms like "if," "provided that," or "on condition that" indicate a condition rather than a promise). Contractor concedes in this Court that the "good faith" language in the indemnity agreement creates no more than a condition for Surety's right to indem-

nity, not a promise by Surety to exercise good faith.

■ A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. *See Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 11 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *City of San Antonio v. Guido Bros. Const. Co.*, 460 S.W.2d 155, 162–63 (Tex.Civ. App.—Beaumont 1970, writ ref'd n.r.e.); *Southwestern Assoc. Tel. Co. v. City of Dalhart*, 254 S.W.2d 819, 825 (Tex.Civ.App.— Amarillo 1952, writ ref'd n.r.e.). Thus, Surety bore the burden at trial of proving that it exercised good faith in settling the claim.[5]

It appears from the trial court's bad-faith finding that it may have erroneously placed the burden on Contractor to prove bad faith. There are appellate decisions, which may have influenced the trial court, suggesting that bad faith is an affirmative defense to indemnification under the type of clause at issue here. *See Safeco Ins. Co. of America v. Gaubert*, 829 S.W.2d 274, 282 (Tex.App.— Dallas 1992, writ denied); *Bass v. Bass*, 790 S.W.2d 113, 119 (Tex.App.—Fort Worth 1990, no writ); *Hess v. American States Ins. Co.*, 589 S.W.2d 548, 551 (Tex.Civ.App.— Amarillo 1979, no writ); *Ford v. Aetna Ins. Co.*, 394 S.W.2d 693, 698 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.). Indeed, the parties apparently concurred in the trial court's placement of the burden of proof, as Surety never invoked the pleading rule for conditions precedent, *see* Tex.R. Civ. P. 54,[6] and Contractor raised bad faith as an affirmative defense in its amended answer.

■ In any event, the trial court's placement of the burden of proof is not assigned as error on appeal. Surety casts its evidentiary challenge as "no evidence of bad faith"

---

5. The indemnity agreement further provides:

An itemized statement of payments made by the Surety for any of the purposes specified herein, sworn to by an officer of the Surety, or the voucher or vouchers for such payments, shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety for such amounts, with interest.

This provision, however, only shifts the burden of production regarding good faith, not the burden of persuasion. *See Clark v. Hiles*, 67 Tex. 141, 2 S.W. 356, 360 (1886); Tex. Jur.2d, Evidence § 103.

*See also Fidelity & Deposit Co. of Maryland v. Wu*, 552 A.2d at 1198–99.

6. Where a party avers generally that all conditions precedent have been performed or have occurred, he or she need only prove those that are specifically denied by the opposite party. *See* Tex.R. Civ. P. 54. This pleading rule, however, does not shift the burden of proof on those conditions which the opposite party denies. *See Trevino*, 651 S.W.2d at 11. Here, Associated never pled that all conditions precedent had been satisfied.

rather than "conclusive evidence of good faith,"[7] and Contractor does not challenge this wording of the issue. Accordingly, we will address the issue as posed by the parties. Before discussing the evidence, however, we examine the appropriate definition of "good faith" (and conversely, "bad faith") under these circumstances.

The indemnity agreement does not define "good faith." The court of appeals determined that, to act in good faith, Surety was required to conduct a "reasonable investigation" of the claims against Contractor and to treat Contractor's interests equally with that of its own. 918 S.W.2d at 596. Surety argues, however, that in the surety context bad faith requires more than an unreasonable or negligent investigation; it requires wilful misconduct or improper motive. We agree with Surety.

■■■■ We construe indemnity agreements under the normal rules of contract construction. *See Great American,* 908 S.W.2d at 427. Our primary goal, of course, is to determine the parties' intent. *See City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *Fox v. Thoreson,* 398 S.W.2d 88, 92 (Tex.1966); *United Founders Life Ins. Co. v. Carey,* 363 S.W.2d 236, 243 (Tex.1962).

The court of appeals, in determining that good faith requires a reasonable investigation, relied on *Fireman's Fund Insurance Co. v. Commercial Standard Insurance Co.,* 490 S.W.2d 818 (Tex.1972). 918 S.W.2d at 589. In *Commercial Standard,* a contractor's employee sued the property owner for injuries incurred while working at the owner's plant. After settling with the employee, the owner's insurance carrier sought indemnity from the contractor (plaintiff's employer) under a contractual indemnity provision. This indemnity provision—unlike the one at issue here—did not expressly vest the indemnitee with authority to settle claims, and did not impose "good faith" as the standard for indemnity. Under these circumstances, the Court applied common law indemnity principles, under which the indemnitee is required

to show that the settlement was not only made in good faith, but that it was also "reasonable considering the risk involved." 490 S.W.2d at 823. *Accord Sira & Payne, Inc. v. Wallace & Riddle,* 484 S.W.2d 559, 561 (Tex.1972); *Gulf, Colorado & Santa Fe Railway Co. v. McBride,* 159 Tex. 442, 322 S.W.2d 492, 495 (1958); *Mitchell's, Inc. v. Friedman,* 157 Tex. 424, 303 S.W.2d 775, 779 (1957).

We have recognized a different standard, however, where the indemnitee is given express authority to settle claims in "good faith." *See Central Surety & Ins. Corp. v. Martin,* 224 S.W.2d 773, 776–77 (Tex.Civ. App.—Beaumont 1949, writ ref'd). Under the indemnity agreement in *Martin,* the principal was required to reimburse the surety for "any and all disbursements ... made by it in good faith under the belief that it is or was liable for the amount so disbursed or that it was necessary or expedient to make such disbursements, whether such liability, necessity or expediency existed or not." *Id.* at 777. We held that this language gave the indemnitee discretion "limited only by the bounds of fraud." *Id.* (quoting *Massachusetts Bonding & Ins. Co. v. Gautieri,* 69 R.I. 70, 30 A.2d 848, 850 (1943)). We further held that this broad discretion did not violate public policy, but rather advanced the public interest:

> There is nothing wrong or unreasonable, or against public policy, in this stipulation. Parties sui juris may lawfully make such stipulations, and are bound by them. . . . The expense, delay, trouble, and risk of loss to the guarantee company is a sufficient safeguard against an unwarranted payment; and, without such a stipulation as complained of here, guarantee companies could not safely do business anything like as cheaply as they do, and to the evident advantage of the parties and of the general public.

*Id.* (quoting *Fidelity & Cas. Co. of New York v. Harrison,* 274 S.W. 1002, 1004–05 (Tex. Civ.App.—Fort Worth 1925, writ ref'd)).

---

**7.** To overcome the trial court's adverse finding on a factual proposition for which it bears the burden of proof, a party is required to establish on appeal that the evidence conclusively establishes the proposition. *See Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982).

In *Ford v. Aetna Insurance Co.,* 394 S.W.2d 693 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.), the indemnity agreement vested the surety with the exclusive right to determine whether claims under the bond should be settled. The court specifically noted that "[c]ommon law principles concerning a surety who claims reimbursement for amounts paid out by it do not apply to indemnity contracts such as the one here involved." *Id.* at 698. Rather, the court held that the surety was limited only by bad faith, which exceeds negligence or even gross negligence. *Id.* The court concluded that improper motive is an essential element of bad faith, and that it may be shown by a "wilful disregard of and refusal to learn facts when available and at hand." *Id.*

Other Texas courts have required evidence of improper motive or fraud to prove bad faith in the suretyship context. *See Hess v. American States Ins. Co.,* 589 S.W.2d 548, 551 (Tex.Civ.App.—Amarillo 1979, no writ); *English v. Century Indem. Co.,* 342 S.W.2d 366, 369 (Tex.Civ.App.—San Antonio 1961, no writ). *See also Engbrock v. Federal Ins. Co.,* 370 F.2d 784, 787 (5th Cir.1967) (applying Texas law).

This approach is consistent with our concept of "good faith" in other circumstances. In *Citizens Bridge Co. v. Guerra,* 152 Tex. 361, 258 S.W.2d 64, 69–70 (1953), we defined bad faith in the commercial paper context:

Knowledge of facts merely sufficient to cause one of ordinary prudence to make inquiry, with failure to make such inquiry, is not evidence of bad faith.... Even gross negligence is not the same thing as bad faith, although it may be evidence tending to prove bad faith.... To constitute evidence of bad faith, the facts known to the taker must be such as reasonably to form the basis for an inference that in acquiring the instrument with knowledge of such facts he acted in dishonest disregard of the rights of the defendant.... Wilful ignorance is the equivalent of bad faith and bad faith may be shown by a wilful disregard of and refusal to learn the facts when available and at hand.

*See also* TEX. BUS. & COM.CODE § 1.201(19) (Tex.UCC) (" 'Good faith' means honesty in fact in the conduct · or transaction concerned.").

We recognize that courts in several jurisdictions, interpreting indemnity agreements similar to the one at issue here, have required the surety to conduct a "reasonable" investigation. *See Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1166 (4th Cir.1983); *Transamerica Ins. Co. v. Bloomfield,* 401 F.2d 357, 363 (6th Cir.1968); *United States v. D Bar D Enterprises, Inc.,* 772 F.Supp. 1167, 1170 (D.Nev. 1991); *Hawaiian Ins. & Guaranty Co. v. Higashi,* 67 Haw. 12, 675 P.2d 767, 769 (1984); *Hartford v. Tanner,* 22 Kan.App.2d 64, 910 P.2d 872, 880 (1996); *City of Portland v. George D. Ward & Assocs.,* 89 Or. App. 452, 750 P.2d 171, 175 (1988). The indemnity agreement at issue here, however, was signed in Texas, and no one disputes that it should be construed under Texas law. In trying to ascertain these parties' intent, therefore, we should presume that they intended to define "good faith" consistently with the Texas decisions discussed above. *See Hardware Dealers Mut. Ins. Co. v. Berglund,* 393 S.W.2d 309, 315 (Tex.1965) ("Contracting parties generally select a judicially construed clause with the intention of adopting the meaning which the courts have given to it."); *Luling Oil & Gas Co. v. Humble Oil & Refining Co.,* 144 Tex. 475, 191 S.W.2d 716, 724 (1945) ("When an agreement is silent or obscure as to a particular subject, the law and usage become a portion of it and constitute a supplement to it and interpret it.").

■ We hold that "good faith" in the surety agreement before us refers to conduct which is honest in fact, free of improper motive or wilful ignorance of the facts at hand. It does not require proof of a "reasonable" investigation by the surety. Stating the proposition conversely for purposes of our evidentiary review for this particular case, "bad faith" means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts.

## B.

■ In reviewing the evidence under a no-evidence point, we consider all the evi-

dence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952); *see also Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24 (Tex.1994) ("The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach].").  "In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to the level that would enable reasonable and fair-minded people to differ in their conclusions." *Moriel,* 879 S.W.2d at 25.  Viewed in this light, we conclude that there is some evidence of Surety's bad faith in settling the claim.

Surety retained Lee Wolz, a construction consultant, to assist Mollenhauer in investigating the claim.  Wolz monitored Mercer's repairs to the pipeline, examining the leaks Mercer excavated.  During this process, Wolz began to suspect that the leaks were caused, at least in part, by faulty design specifications.  He sent a memorandum to Mollenhauer in February 1991 stating that, due to the unstable soil, "[i]t is next to impossible to restrain the pipe while it is being laid over a long distance."  Wolz recommended that Surety "consult with an engineering firm to determine if this might not be a case of designed materials/application being an impossible spec to achieve."  Instead of retaining an independent engineering firm to evaluate the leaks, Mollenhauer testified that he relied on his own engineering training, the opinions of Owner's engineer, and the opinions of Arthur Mercer, president of Mercer & Ussery.  Yet Mollenhauer admitted during discovery that he was not an expert on what caused the leaks.  Furthermore, both Owner's engineer and Mercer had a potential conflict of interest.  Owner was directly opposed to Contractor in the dispute and Mer-

cer was Contractor's direct competitor.  Also, Mario Diponio testified that during the April 5 meeting, one of Surety's representatives stated that there was a "good case" that Owner's engineers were at fault.  Surety, however, settled the case a short time later.

There is significant evidence that Surety did investigate and settle in good faith, and we do not intimate that we would have decided this issue the same were we the trier of facts or even empowered to conduct a factual sufficiency review.  Nevertheless, we conclude that the evidence outlined above is some evidence of bad faith, and we therefore affirm the judgment of the court of appeals insofar as it denies Surety relief under the indemnity agreement.

## C.

■  Surety contends that, in any event, it was not required to investigate the design issue under the circumstances of this case. It argues that Contractor waived any defense based on "design error" by continuing to perform the construction contract after learning of the alleged design flaw.  *See Board of Regents of Univ. of Texas v. S & G Constr. Co.,* 529 S.W.2d 90, 97 (Tex.Civ. App.—Austin 1975, writ ref'd n.r.e.).[8]  Thus, because Contractor could not have raised this defense in response to Owner's demand for repairs, Surety as a matter of law was not required to investigate it.

Assuming that the *Board of Regents* rule applies to this case, an issue we need not decide, we disagree that it relieved Surety of all obligation to investigate the design issue. Even if the alleged design flaw would not have excused Contractor from completing the contract, it was nonetheless a highly relevant factor regarding the parties' respective rights.  Indeed, under the *Board of Regents* rule, on which Surety relies, Contractor would have had a claim against Owner for any damages Contractor incurred from the alleged design flaw.  Under these circum-

---

**8.** Surety relies on the following language in *Board of Regents:*

[W]hen one party breaches its contract, the other party is put to an election of continuing or ceasing performance, any action indicating an intention to continue will operate as a conclusive choice, not depriving the injured party

of his cause of action for the breach which has already taken place, [but] depriving him ... of any excuse for ceasing performance on his own part.

529 S.W.2d at 97.  *See also* WILLISTON ON CONTRACTS, § 1334 (3d ed.1968).

stances, Surety could not wilfully ignore the design issue in resolving Owner's claim. Because there is some evidence of this, as outlined in the previous section, Surety is not entitled to indemnity.

## IV. Deceptive Trade Practices Act

By cross-application, Contractor argues that the court of appeals erred by affirming the trial court's judgment denying recovery under the DTPA. Contractor contends that Surety violated the DTPA by engaging in unconscionable conduct, *see* TEX. BUS. & COM. CODE § 17.50(a)(3), committing misrepresentations, *see id.* § 17.46(b)(5), and concealing information. *See id.* § 17.46(b)(23). Specifically, Contractor argues that Surety negotiated with Owner without Contractor's knowledge or consent, in violation of Surety's promise not to do so, thereby infringing on Contractor's opportunity to resolve the dispute through arbitration.

▆▆▆ The court of appeals held that, while there was evidence that Surety committed a deceptive act, there was no evidence that such violation was a producing cause of damage to Contractor. 918 S.W.2d at 599. We need not decide the first issue because we agree that there is no evidence of causation.[9]

The construction contract between Owner and Contractor authorized either party to submit disputes to arbitration. Guilio Catallo, CAT's president, told Mollenhauer at their initial meeting in September 1990 that Contractor wanted to pursue arbitration and that Owner's engineer had already orally agreed to this approach. Catallo further testified that Mollenhauer told him at the September meeting that Surety would not interfere with Contractor's efforts to resolve the dispute through arbitration.

On September 25, 1990, after meeting with Owner, Mollenhauer agreed to repair the fourteen initial leaks under a reservation of rights. That same day, Contractor sent to Owner a formal, written demand for arbitration under the contract. Two weeks later, Owner responded that, in its view, Contrac-

tor's arbitration demand was not timely. Contractor took no further efforts to enforce whatever arbitration rights it had under the contract.

Contractor contends that Surety's involvement in the dispute caused Owner to back out of an informal arbitration agreement, thereby causing Contractor to lose its rights under the construction contract. However, there is no evidence that Surety did anything to dissuade Contractor from making an earlier arbitration demand, or that Surety in any way interfered with Contractor's right to enforce the arbitration agreement. Contractor never made any effort to assert its contract claims against Owner, either through enforcement of its arbitration rights or through an ordinary civil suit. Under these circumstances, Surety's involvement in the investigation and its agreement to make repairs cannot be the producing cause of Contractor's loss of its contract claims against Owner.

## V. Fiduciary Duty

Contractor next argues by cross-application that the court of appeals erred in holding that there is no evidence of an informal fiduciary relationship or confidential relationship between Contractor and Surety, and in not reaching the issue of breach of that duty. Contractor contends that Surety's actions induced Contractor to trust and rely on Surety, thereby creating such a relationship.

▆▆▆ An informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962). "[T]he law recognizes the existence of confidential relationships in those cases 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992) (quoting *Texas Bank & Trust Co. v. .Moore,* 595 S.W.2d

---

9. Associated also argues that Joint Venture is not a consumer under the DTPA because any "service" Associated provided to Joint Venture ended when Associated issued the bonds, before it conducted the investigation at issue. Because we find no evidence of causation, we also do not reach this issue.

502, 507 (Tex.1980)). We do not create this duty lightly, however. To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex.1995).

■ There is no evidence of such a preexisting relationship between Surety and Contractor. To support its claim of a confidential relationship, Contractor relies only on the contractual indemnity agreement and Surety's conduct in investigating Owner's claim. The indemnity agreement, however, was an arms-length transaction entered into for the parties' mutual benefit. There were no prior dealings between Contractor and Surety justifying a special relationship of trust and confidence. Accordingly, we agree with the court of appeals that Contractor cannot recover for breach of fiduciary duty.

### VI. Additional Causes of Action

The trial court also rendered findings for Contractor on 1) fraud, 2) tortious interference with contract, and 3) negligent misrepresentation. Surety challenged these findings in the court of appeals, but because that court affirmed the judgment for Contractor on the basis of common law bad faith, it did not reach them. Surety does not challenge these findings here. Contractor argues that because the findings are independent grounds to support the trial court's judgment, and have not been attacked by Surety, we must affirm the trial court's judgment.

■ This situation is discussed in *McKelvy v. Barber,* 381 S.W.2d 59, 65 (Tex.1964). Under *McKelvy,* Surety has not waived its challenge to the three independent grounds by not attacking them here. This Court may either remand the cause to the court of appeals to consider them, or we may consider them in the first instance. *Id.* We opt for the latter in this case.

Each of these additional causes of action—like Contractor's DTPA cause of action—centers on Contractor's claim that Surety caused it to lose its arbitration rights. As discussed earlier, there is no evidence that Surety interfered with Contractor's ability to enforce its legal rights under the construction contract, whether by arbitration or otherwise. Accordingly, we cannot affirm the judgment of the court of appeals for Contractor on these alternative grounds.

\* \* \*

For the foregoing reasons, we reverse the judgment of the court of appeals in part and affirm in part, rendering judgment that all parties take nothing.

OWEN, Justice, filed a concurring and dissenting opinion, in which HECHT, Justice, joins.

OWEN, Justice, joined by Justice HECHT, concurring and dissenting.

I join in the Court's opinion except for part III–B.

I agree with the standard for lack of good faith adopted by the Court. However, no court in the country has applied that standard to facts such as those present in this case and found bad faith. The carefully balanced articulation of "good faith" by the Court is meaningless if it is going to be misapplied, as the Court has done. I would hold that there is no evidence of improper motive or wilful ignorance of the facts.

The Court recognized that "good faith" under the parties' indemnity agreement is not the equivalent of negligence:

"[G]ood faith" in the surety agreement before us refers to conduct which is honest in fact, free of improper motive or wilful ignorance of the facts at hand. It does not require proof of a "reasonable" investigation by the surety. Stating the proposition conversely for purposes of our evidentiary review for this particular case, "bad faith" means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts.

964 S.W.2d at 285. Nevertheless, the Court relies on evidence of, at most, mere negligence by Associated.

The Court relies on three pieces of evidence. First, the Court notes that Steve

Mollenhauer, the Associated adjuster assigned to this claim, did not retain an independent engineering firm to investigate the cause of the leaks. However, Mollenhauer testified without dispute that, during their initial meeting, CAT's representatives told him that *they* planned to hire an engineering firm to substantiate their claims of design error. After that meeting, Mollenhauer sent a follow-up letter to Guilio Catallo, dated September 17, 1990, stating:

Dear Mr. Catallo:

You indicated during our meeting on 9/11/90 that you intend to seek arbitration on the issues of whether the leakage problem is caused by design or workmanship problems. To substantiate your position, you were planning on retaining both an attorney experienced in construction matters and an engineering expert.

Since the deadline for the Surety's response to the Cameron County Fresh Water Supply District is September 26, 1990, we will need a statement of your position with respect to the default by Friday, September 21, 1990 at the latest.

According to Mollenhauer's contemporaneous progress notes, Catallo called him one week later and told him that CAT was meeting with an engineering expert "possibly as early as this afternoon." However, CAT did not present any engineering report to Associated until six months later, at the parties' April 5, 1991 meeting in Houston. At that meeting, Maury Stiver, the engineer retained by CAT, presented his conclusions concerning the inadequacy of the pipeline bedding and pipe selection. It is undisputed, however, that Stiver had not visited the worksite and thus had made no physical investigation of the construction, the repair work, or the pipeline. Associated thus decided to rely on the opinion of Mollenhauer, who himself was an engineer, and Arthur Mercer, the engineer who excavated and repaired the leaks, that the leaks were caused by poor workmanship.

Under these circumstances, Mollenhauer's failure to retain an independent engineering firm cannot be evidence of dishonest motive or wilful disregard of the facts. To the contrary, it is undisputed that CAT agreed to develop this evidence, that Associated gave it an opportunity to do so, and that when CAT finally did retain an expert, Associated listened to his conclusions. Surely, Associated's decision not to accept the conclusions of an expert who had not even examined the pipeline is not evidence of dishonest motive or wilful disregard of the facts. It could be argued that Associated should have itself retained an expert to inspect the pipeline, but this is, at most, evidence of negligence. It does not approach the level of culpability required under the bad faith standard adopted by the Court.

Second, the Court notes that Mercer was a competitor of CAT, somehow suggesting that for this reason it was dishonest or improper for Associated to rely on his opinion. As noted, however, Mercer is the engineer who excavated and repaired the pipeline, and thus he was in the best position to opine as to the cause of the leaks. Assuming, for the sake of argument, that Mercer did have some competitive-based bias against CAT, this at most injects an element of negligence into the investigation, not dishonesty or wilful disregard of the facts. There is absolutely no evidence that Associated colluded with Mercer regarding the substance of his opinion.

Finally, the Court notes that a representative of CAT testified that during the April 5 meeting, one of Surety's representatives stated that there was a "good case" that Owner's engineers were at fault. The Court does not explain how this isolated statement equates to evidence of bad faith. It is unclear from this testimony as to what point in the meeting Associated's representative made this statement or the context in which it was made. This testimony, standing alone, cannot constitute evidence that Associated's subsequent settlement was made with a dishonest or improper motive.

Under the Court's application of the good faith standard, any evidence that a surety did not conduct the fullest investigation possible equates to evidence of bad faith. Not only does this contradict the "dishonest in fact" test that the Court purports to adopt, it appears to be even more relaxed than the "negligence" standard that the court of appeals adopted. Moreover, this approach will wreak havoc with the tripartite suretyship

relationship. The Court recognizes that the standard indemnity provisions at issue here, under which the surety is authorized to settle claims in good faith, are "critical in enabling sureties to perform efficiently." 964 S.W.2d at 281 & n. 2. Under the Court's approach, however, a fact issue on good faith will exist for virtually every claim settled by sureties. This will have an obvious and profound impact on sureties' ability and willingness to settle such claims, resulting in needless litigation costs and ultimately damaging the interests of the underlying public-works projects the sureties are retained to protect.

\* \* \*

For the foregoing reasons, I dissent from that portion of the Court's judgment affirming the take-nothing judgment against Associated on its indemnity claim. I would render judgment for Associated on its indemnity claim against CAT. I concur in that portion of the Court's judgment against CAT on its claims for affirmative relief.