Opinion issued August 18, 2011


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00479-CV

———————————

PATRICIA MUSKE, Appellant

V.

CHARLES A.
MENKE, Appellee



 



 

On Appeal from the 506th District Court

Waller County, Texas



Trial Court Case No. 08-11-19577

 



 

MEMORANDUM OPINION

Appellant
Patricia Muske appeals from a final summary judgment granted in favor of
appellee Charles Menke.  Muske and Menke
are cousins who owned undivided interests in a 626-acre property in Waller
County known as the Live Oaks Section.  Muske
sold her interest in the property to Menke in February 2006.  In November 2007, Menke sold the Live Oaks property
to the Katy Prairie Conservancy.  When Muske
learned of the sale, she sued Menke, contending that he induced her to sell her
interest by concealing his intent to resell it at a higher price.  Muske brought causes of action for breach of
fiduciary duty, negligent misrepresentation, common-law fraud, and fraud in a
real estate transaction.  The trial court
granted Menke’s motion for summary judgment on Muske’s claims.  On appeal, Muske challenges the summary
judgment, contending that the trial court erred by holding that Menke did not
owe Muske a fiduciary duty as a matter of law, and that the evidence raises a
fact issue on her common-law and statutory fraud claims and her claim for
negligent misrepresentation.

We affirm the trial court’s
judgment that Menke owned no fiduciary duty to Muske.  We reverse the judgment as to Muske’s fraud
and misrepresentation claims and remand for further proceedings consistent with
this opinion.

Background

Muske and Menke grew up together: their families often spent time together and visited
each other’s homes.  After reaching
adulthood, Menke continued to be close to Muske’s father, but his relationship
with Muske was, at times, strained.

Muske and Menke obtained their separate
interests in Live Oaks through inheritance. 
They did not always agree about how to manage the property, and they
independently managed their respective interests.  In his deposition, Menke testified that
“[Muske] and I have had extreme difficulty over the years agreeing on anything
having to do with [the Live Oaks] property.” 
Muske testified similarly that she and Menke had expressed different
opinions about the best way to manage the property.  Menke did not represent Muske or handle any
business dealings for her, and Muske negotiated separate agreements with
parties interested in using or buying the property. She also maintained a
separate insurance policy covering her interest in the property.

In 2004, J.R. Tucker expressed an
interested in purchasing the property and told Muske that he wanted to buy Live
Oaks.  Muske conveyed information about
the offer to Menke, and he agreed to the deal. 
They entered into a contract to sell Live Oaks to Tucker for $2,500 per
acre.  By the spring of 2005, however,
Tucker terminated his option to purchase the property, and the parties never completed
the sale.

In the fall of 2005, Menke met with
Mary Ann Piacentini, the Katy Prairie Conservancy’s executive director,
concerning its interest in Live Oaks.  At
the time, Live Oaks was one of approximately 50 properties the Conservancy was
interested in acquiring.  Menke testified
that he and Piancentini discussed land values in the area and the possibility
that he might transfer either his undivided interest or seek partition of his
interest from Muske’s interest and transfer that to the Conservancy.  Piancentini stated that, in their first
meeting, her “sense was that [Menke] was interested in selling . . . either his
undivided interest or having the whole parcel, if we were interested in it,
sold to us.  He just wanted to see if
there was a way to work a deal.”

During her deposition, Piacentini
gave conflicting testimony about when she first met with Menke to discuss the
Live Oaks property.  She initially testified
that they did not meet until 2006 or 2007.  However, the Conservancy’s records of business
with Menke date back to 2005.  The
records reflect that Menke and Piacentini met on October 12, 2005, “to discuss
the sale of his undivided interest.”  The
notes state: “[Menke] is interested in selling to [the Conservancy].  He says he can sell . . . an undivided interest
or he can partition and get 33% of 640 acres sectioned off.  He initially thought of asking his cousin
[Menke] for the top 1/3rd . . . .”  Piancentini also testified that, at the time
of her first meeting with Menke, he still co-owned land with Muske.  But Menke did not purchase Muske’s interest in
Live Oaks until February 2006.  When asked
about the inconsistencies, Piacentini testified:  “My memory [of the dates] could be
faulty.”  

In late 2005, after seeing a “for
sale” sign on another piece of property owned by Muske, Menke called her to
determine whether she might sell her interest in Live Oaks to him.  Muske testified that before she agreed to
sell her interest, she asked Menke, “Do you have a buyer?”  According to Muske, Menke responded, “No.”  Muske also asked, “What are you going to do
with it?”  She testified that Menke
answered, “I’m going to keep it in the family.”  Muske considered Menke’s offer and called him
in early January 2006 to ask if he was still interested in buying the property
and if so, to make an offer.  Menke
offered to buy Muske’s share for $2,200 per acre.  His offer was $300 less per acre than the
previous offer made by J.R. Tucker.  Both
Muske and Menke testified similarly that the offer was lower because, in
contrast to the terms of the option agreement with Tucker, Muske would not have
to pay a sales commission or closing costs, and she would retain the mineral
and royalty interests in the land.  Muske
also agreed to extend $600,000 in unsecured credit to Menke without requiring written
terms for repayment.  The sale was
completed in February 2006.

Menke resumed discussions with the
Conservancy to sell the property in 2006, and in August 2007 he entered into a
contract to sell Live Oaks to the Conservancy for $4,000 per acre.  That sale closed in November 2007.

After learning of the subsequent sale,
Muske sued Menke for, among other things, breach of fiduciary duty, negligent
misrepresentation, and common-law and statutory fraud.  The trial court granted Menke’s motion for
summary judgment, and Muske appealed.  On
appeal, Muske argues that the trial court erred in holding that Menke did not
owe Muske a fiduciary duty as a matter of law and that the evidence raises a
fact issue on her common-law fraud, statutory fraud, fraudulent
misrepresentation, and negligent misrepresentation claims.

Analysis

We review a trial court’s ruling on
a motion for summary judgment de novo.  Mann Frankfort Stein & Lipp Advisors,
Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  A motion for summary judgment must “state the
specific grounds” upon which the judgment is sought.  Tex.
R. Civ. P. 166a(c).  The
motion must “stand or fall on the grounds expressly presented in the
motion.”  McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex.
1993).  To prevail, the movant has the
burden of proving that there is no genuine issue of material fact and that it
is entitled to judgment as a matter of law. 
Nixon v. Mr. Prop. Mgmt. Co.,
690 S.W.2d 546, 548–49 (Tex. 1985); see Tex. R. Civ. P. 166a(c).  A defendant moving for summary judgment must conclusively
negate at least one essential element of each of the plaintiff’s causes of
action or conclusively establish each element of an affirmative defense.  Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).

Once the defendant produces sufficient evidence
conclusively establishing his right to summary judgment, the burden of proof
shifts to the plaintiff to present evidence sufficient to raise a fact
issue.  Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995)
(citing “Moore” Burger, Inc. v. Phillips
Petroleum Co., 492 S.W.2d 934, 936–37 (Tex. 1972)).  In deciding whether there is a disputed issue
of material fact precluding summary judgment, “evidence favorable to the
non-movant will be taken as true” and “[e]very reasonable inference must be
indulged in favor of the non-movant and any doubts resolved in its favor.”  Nixon,
690 S.W.2d at 548–49.

I.                 
Breach of fiduciary duty claim 

In her second and third issues, Muske
contends that the trial court erred in granting summary judgment because the
evidence raises a fact issue on whether Menke owed her a fiduciary duty.  To recover under a cause of action for breach
of fiduciary duty, a plaintiff must show that the defendant owed her a
fiduciary duty and breached that duty, and that the breach proximately caused
her damages.  See, e.g., Plotkin v.
Joekel, 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet.
denied).  Muske and Menke do not have the
kind of special relationship that gives rise to a fiduciary duty, such as an
attorney-client or trustee-beneficiary relationship.  See,
e.g., Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193,
199 (Tex. 2002).  Absent a special
relationship, co-tenants do not owe each other a fiduciary duty.  Scott v
Scruggs, 836 S.W.2d 278, 282 (Tex. App.—Texarkana 1992, writ denied).  Muske also alleged that she and Menke were partners, but absent
other evidence of an agreement, their joint dealings in leasing their undivided
interests in Live Oaks do not transform their co-tenancy into a partnership.  See Tex. Bus. Orgs. Code Ann. § 152.052(b)(2) (West
Supp. 2010).

Muske primarily relies on her
lifelong family friendship with Menke as the source of his alleged fiduciary
duty to her.  “An informal fiduciary duty
may arise from a moral, social, domestic or purely personal relationship of
trust and confidence, generally called a confidential relationship.”  Assoc.
Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 287 (Tex.
1998).  This duty is not lightly
created.  Id. at 288.  “To impose an
informal fiduciary duty in a business transaction, the special relationship of
trust and confidence must exist prior to, and apart from, the agreement made
the basis of the suit.”  Id. 
“[M]ere subjective trust does not . . . transform arm’s-length dealing
into fiduciary relationship.”  Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 177 (Tex. 1997).  “Although .
. . the existence of a confidential relationship is ordinarily a question of
fact, when the issue is one of no evidence, it becomes a question of law.”  Crim
Truck & Tractor Co. v. Navistar Int’l Transp. Corp., 823 S.W.2d 591,
594 (Tex. 1992). 

The evidence before the trial court
shows that Muske and Menke, though cousins, did not have a close relationship
during adulthood and that Muske managed her business affairs without input or
guidance from Menke.  She made
independent decisions with respect to Live Oaks, often in conflict with
Menke.  These facts belie any suggestion
that Muske has the kind of trust and confidence in Menke that demonstrates the
existence of a fiduciary relationship. 
Further, despite Muske’s profession of continued familial affection, her
willingness to extend generous credit terms, and Menke’s close relationship
with her father, the evidence shows that their relationship is not the kind of
“close family relationship” that gives rise to a fiduciary duty.  See
Consolidated Gas & Equip. Co. v. Thompson, 405 S.W. 2d 333, 336–37
(Tex. 1966) (“The usual cases of fiduciary relationship have been
attorney-and-client, partners, close family relationships such as that of parent-and-child,
and joint adventurers, particularly when there is an agreement . . .
to share gains and losses.”).  Muske’s
expressed love for and trust in Menke, including her trust that he would repay
an unsecured loan, “is not enough to transform arms-length dealing into a
fiduciary relationship.”  Thigpen v. Locke, 363 S.W.2d 247, 253
(Tex. 1962).  Therefore, the trial court
correctly granted summary judgment on the breach of fiduciary duty claim.  Muske’s second and third issues are overruled.

II.              
Fraud and misrepresentation claims 

In her remaining issues, Muske
challenges the propriety of summary judgment on her claims for common-law
fraud, statutory fraud in a real estate transaction, and negligent
misrepresentation.  Menke moved for
summary judgment based on his assertion that the facts are undisputed that he
told the truth and that in fact he had no buyer at the time of his alleged
misrepresentation to that effect.  In
response, Muske contends that a fact issue exists concerning the veracity of Menke’s
statement that he had no buyer.

To
establish fraud or misrepresentation, a plaintiff must show, among other
things, that the defendant made a false statement concerning a past or existing
material fact.  Ins. Co. of N. Am.
v. Morris, 981 S.W.2d 667, 674 (Tex. 1998).  This element requires proof that when Menke
made the representation, he “knew it was false or made it recklessly without
any knowledge of the truth and as a positive assertion.”  Id.
 A
false representation may consist of a deceptive answer or any other indirect or
misleading language, and a statement that is literally true may be actionable
if used to create an impression that is substantially false.  See Nelson
v. Najm, 127 S.W.3d 170, 175 (Tex. App.—Houston [1st Dist.] 2003, pet.
denied); Blanton v. Sherman Compress Co.,
256 S.W.2d 884, 887 (Tex. App.—Dallas 1953, no writ).

Muske
argues that the evidence of Menke’s meeting with the Conservancy in October
2005 raises a fact issue concerning whether Menke had a buyer at the time he
offered to buy her interest in Live Oaks, and therefore whether he misrepresented
the facts to her by saying he did not.  Indulging
all reasonable inferences in favor of Muske, the non-movant, the evidence shows
that Menke approached Piacentini in 2005 to discuss the sale of Live Oak to the
Conservancy.  Piancentini testified that
the Conservancy was interested in acquiring the land, and the Conservancy’s
records show that Menke was interested in selling his interest.  The records also show that Menke “initially
thought of asking [Muske] for the top 1/3rd.”  Although serious negotiations to sell Live
Oaks did not resume until after Menke obtained control over the property, there
is evidence that Menke was aware that the Conservancy was interested in
purchasing Live Oaks and that its interest extended to Muske’s ownership
interest in the property.  Piacentini further
testified that she discussed a possible purchase price with Menke.  Although Piacentini could not directly recall
the price discussed, she said it could have been around $3,000 per acre.

Menke
did not argue that the issue of whether he intended to resell the property was
immaterial, nor did he argue that Muske’s claimed reliance on his statements
was unreasonable.  His sole argument
relies on a distinction of semantics—that his oral denial that he had a “buyer”
was technically truthful.  Specifically,
he argued that the word “buyer” connotes an actual sale, including a signed
writing because a contract for the sale of land is not enforceable unless it is
in writing and signed by the party seeking to enforce it.  See
Tex. Bus. & Com. Code Ann. § 26.01 (West
2009) (statute offFrauds).  Menke thus argued
that he did not have a “buyer” when he talked to Muske, and that the
Conservancy did not become a “buyer” until it agreed to purchase Live Oaks in
2007.  

Muske
contends, however, that her question about a “buyer” inquired more generally
about whether Menke had identified someone who was interested in the land.  She testified:  “It does not mean the deal is closed.  It does not mean there’s been a
commitment.  It simply means they are
interested in that particular piece of property at that time.”  She testified that this meaning was “tacit
within the question,” and that Menke “perfectly well knew what that question meant.”

“In
deciding whether there is a disputed material fact issue precluding summary
judgment, evidence favorable to the non-movant will be taken as true.”  Nixon,
690 S.W.2d at 548–49.  “Every reasonable
inference must be indulged in favor of the non-movant and any doubts resolved
in its favor.”  Id.  Menke’s word-parsing
argument based on a narrow definition of the word “buyer” violates these
principles.  In the context of a material
ambiguity in a contract, “the granting of a motion for summary judgment is
improper because the interpretation of the instrument becomes a fact
issue.”  Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983).  The same logic holds true for the disputed interpretation
of an alleged oral misrepresentation to the extent that the defendant claims
truth as his legal defense.  See id.; see also Nelson, 127 S.W.3d at 175 (finding an affirmative
misrepresentation when defendant’s statements created false impression of
facts).

Resolving
any doubts about the evidence in Muske’s favor, the summary judgment cannot be
supported on the sole basis argued by Menke in the trial court, i.e., that
the evidence affirmatively disproves any misrepresentation.  See Nelson,
127 S.W.3d at 175; see also Chandler v. Butler, 284 S.W.2d 388,
394–95 (Tex. App.—Texarkana 1955, no writ) (“Whenever issues of fraud and good
faith are raised, the evidence must take a rather wide range and may embrace
all the facts and circumstances which go to make up the transaction, disclose
its true character, explain the acts of the parties, and throw light on their
objects and intentions.”) (quoting Blanton,
256 S.W.2d at 888).  The word “buyer” is
commonly used to connote not only a person who has already bought or agreed to
buy something, but also a person who contemplates a purchase.  Moreover, it is not unusual to use the word
“buyer” in a subjunctive context when speaking about a contingent, hypothetical,
or prospective circumstance in which a person may buy or agree to buy in the
future.  There is no evidence that Muske
used or that Menke understood the word “buyer” in the narrow sense advanced in
Menke’s summary-judgment motion.  Indeed,
the only evidence
of the parties’ understanding in regard to the communications at issue is
Muske’s testimony that a buyer “means someone who’s interested in [the land],”
and that Menke “perfectly well knew what that question meant.”  Muske’s
understanding of a “buyer” as a person “interested in [a] particular piece of
property” is plausible in the context of the communication and could be
credited by reasonable jurors.  

Because
the pleadings and evidence on file raise a genuine issue of material fact as to
whether Menke made a misrepresentation to Muske, we hold that the trial court
erred in granting summary judgment with respect to those claims.  See Nelson,
127 S.W.3d at 175.  We sustain Muske’s
fourth, fifth, and sixth issues on appeal.

Conclusion

          We reverse the trial court’s judgment
on Muske’s fraud and negligent misrepresentation claims and remand for further
proceedings consistent with this opinion. 
The judgment of the trial court is otherwise affirmed.  

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel consists of Chief Justice Radack
and Justice Massengale.*











*        This case
was submitted on April 12, 2011 before a panel consisting of Chief Justice
Radack and Justices Alcala and Massengale. 
After submission, Justice Alcala left the Court to become a judge on the
Court of Criminal Appeals.  The case is
therefore being decided by the two remaining justices.  See
Tex. R. App. P. 41.1(b).