Nos. 04-99-00222-CV & 04-99-00224-CV



IN THE INTEREST OF George BREEDEN



From the County Court, Kerr County, Texas


Trial Court Nos. 23665 & 99-048


Honorable Frederick L. Henneke, Judge Presiding



Opinion by: Catherine Stone, Justice


Sitting: Catherine Stone, Justice

 Sarah B. Duncan, Justice

 Karen Angelini, Justice


Delivered and Filed: June 2, 1999


ORDER FOR TEMPORARY MENTAL HEALTH SERVICES VACATED; ORDER
AUTHORIZING PSYCHOACTIVE MEDICATION VACATED


 In this mental illness case we are asked to determine whether clear and convincing evidence
supports appellant's court-ordered committment to Kerrville State Hospital and his court-ordered
treatment with psychoactive medication.

 On March 23, 1999, the trial court, having found that George Breeden was mentally ill and
unable to make a rational and informed decision about whether or not to submit to treatment, ordered
that he be committed to the Kerrville State Hospital for in-patient care for a period not to exceed 90
days. By separate order, the trial court also authorized treatment with psychoactive medication
during Breeden's temporary hospitalization.

 Breeden appeals from both orders, challenging the legal and factual sufficiency of the evidence
to support the trial court's findings that protective custody and psychoactive medication are
necessary. He also claims that his temporary commitment violates his constitutional right to freedom
of speech, expression, and thought. Finding the evidence insufficient to support involuntary
hospitalization, we reverse the trial court's orders.(1)

Involuntary Commitment


 In Texas, a judge may not order temporary inpatient mental health services unless the judge
finds from clear and convincing evidence that:

 (1) the proposed patient is mentally ill; and

 (2) as a result of that mental illness the proposed patient:

 (A) is likely to cause serious harm to himself;

 (B) is likely to cause serious harm to others; or

 (C) is:

 (i) suffering severe and abnormal mental, emotional, or physical distress;

 (ii) experiencing substantial mental or physical deterioration of the proposed
patient's ability to function independently, which is exhibited by the proposed
patient's inability, except for reasons of indigence, to provide for the proposed
patient's basic needs, including food, clothing, health, or safety; and 

 (iii) unable to make a rational and informed decision as to whether or not to
submit to treatment.


Tex. Health & Safety Code Ann. § 574.034(a) (Vernon Supp. 1999). To be clear and convincing
under this section, the evidence must include expert testimony and, unless waived, evidence of a
recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of
serious harm to the proposed patient or others, or the proposed patient's distress and the
deterioration of the proposed patient's ability to function. Id. at § 574.034(d)(1), (2) (emphasis
ours). Expert opinion recommending involuntary temporary commitment must be supported by a
factual basis. In re J.S.C., 812 S.W.2d 92, 95 (Tex. App.--San Antonio 1991, no writ). A bald
diagnosis alone is insufficient to support commitment. See id. 

 Clear and convincing evidence is that measure or degree of proof that will produce in the mind
of the trier of fact a firm belief or conviction about the truth of the allegations sought to be
established. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979). The proof must be more than
merely the greater weight of the credible evidence, but there is no requirement that the evidence be
unequivocal or undisputed. Id.

 In the instant case, the trial court determined that Breeden was mentally ill and that he should
be involuntarily hospitalized because he will, if not treated, continue to suffer severe and abnormal
mental, emotional, or physical distress; continue to experience deterioration of his ability to function
independently; and remain unable to make a rational and informed decision as to whether or not to
submit to treatment.(2) In his first point of error, Breeden argues that there is no evidence, or
alternatively insufficient evidence, to support these necessary findings for involuntary commitment
by clear and convincing evidence.

 In considering Breeden's no evidence challenges, we review all the evidence in the light most
favorable to the trial court's findings, indulging every reasonable inference in favor of those findings,
see Associated Indem. Corp. v. Cat Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex. 1998), to
determine whether more than a scintilla of evidence supports the challenged findings. See Formosa
Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). In the
context of the State's heightened burden of proof, we will sustain a no evidence challenge if the
evidence is insufficient to produce in the mind of the fact-finder a firm belief or conviction as to the
truth of the facts. Johnstone v. State, 961 S.W.2d 385, 388 (Tex. App.--Houston [1st Dist.] 1997,
no writ). 

 In considering Breeden's insufficient evidence challenges, we may set aside the findings only
if a review of all the evidence demonstrates that the evidence which supports the findings is so weak
as to be clearly wrong and manifestly unjust. See Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 
With these standards in mind, we turn to the evidence presented at the hearing for court-ordered
mental health services.

Medical Testimony

 The State called Dr. Michael Lennhoff as its first witness. Dr. Lennhoff, a staff psychiatrist
at Kerrville State Hospital, met with and evaluated Breeden on two occasions. Dr. Lennhoff
tentatively diagnosed Breeden as suffering from a schizoaffective disorder - a thought disorder
coupled with a mood or affective condition in the spectrum of schizophrenias. Dr. Lennhoff testified
that Breeden is bothered by physical sensations described by Breeden as "pops and snaps," which
Breeden believes are being transmitted to him by external agents. Dr. Lennhoff stated that Breeden
has peculiar ideas, which Dr. Lennhoff characterized as psychotic in nature. Dr. Lennhoff testified
that Breeden also hears bombing noises. Breeden refuses medication to relieve these aggravations. 
At this point, Dr. Lennhoff was of the opinion that Breeden was a harm to himself because he refuses
medication and he is not eating well. Dr. Lennhoff admitted, however, he has no independent
knowledge regarding Breeden's nutritional health. He learned that information from Breeden's
medical chart. Dr. Lennhoff also expressed the opinion that Breeden could be a potential harm to
others if his condition worsens. It was Dr. Lennhoff's belief that if not treated, Breeden would
continue to suffer severe and abnormal mental, emotional, or physical distress, and would continue
to experience deterioration of his ability to function independently.

 Dr. Yousuf Allawala, Breeden's treating physician, testified next for the State. Dr. Allawala
met with Breeden once and tentatively diagnosed him as suffering from chronic paranoid
schizophrenia. He agreed with Dr. Lennhoff's opinion that Breeden's condition is coupled with a
mood disorder. Dr. Allawala testified that Breeden is likely to cause serious harm to himself because
he isolates himself and he is not eating adequately. With respect to Breeden's isolation, Dr. Allawala
expounded:

 by isolating himself, it's not good -- you know, he is not socially interacting with
other people and, you know, may not be taking care of himself. You know, there's
nobody to look after or be concerned about what -- how he is eating, how is he living
and -- you know, if the person isolates himself, you know. If you have a lot of
friends, maybe you know, your friends would -- would be -- would pick up on
whether, you know, you are taking care of yourself. So that addresses that a person
may -- may neglect self and not be able to take care of himself by isolation.


Dr. Allawala admitted he did not have evidence that Breeden was not eating well, although he did
state that Breeden was substantially underweight for his height and body type. Breeden weighs 120
pounds, standing at five feet, seven inches tall. Dr. Allawala opined that Breeden's paranoia may
prevent him from going to the grocery store or buying his own groceries. Dr. Allawala noted that
Breeden is a selective eater, and since his hospitalization, he has skipped meals altogether or has not
eaten his entire meal. Dr. Allawala agreed with Dr. Lennhoff's assessment that Breeden would suffer
severe and abnormal mental, emotional, or physical distress if he was not treated, and that if not
treated, he would continue to deteriorate in his ability to function independently. And it was Dr.
Allawala's opinion that Breeden lacked the ability to make a rational and informed decision about
whether to submit to treatment.

 Dr. Vernon Grove, Jr. was called as the State's third expert witness. Dr. Grove testified that
Breeden has a thought and mood disorder, but he was unwilling to diagnose Breeden's condition as
paranoid schizophrenia. It was Dr. Grove's opinion that Breeden's diagnosis could not be certain
without further evaluation. Dr. Grove concurred with the other testifying doctors that Breeden, if
not treated, would continue to suffer severe and abnormal mental, emotional, or physical distress, and
that Breeden would continue to deteriorate in his ability to function independently. When asked to
state the way in which Breeden's illness manifests itself in behavior that might cause harm to Breeden
or others, Dr. Grove, without clarification, responded, "passively."

Lay Testimony

 Elaine Glover, Breeden's caseworker of four months, testified next for the State regarding
her impression of Breeden's condition and the underlying reasons for his recent hospitalization.
Glover testified that Breeden's mental condition has declined in the past few months. He has become
more paranoid and withdrawn. Recently Breeden wrote Glover a lengthy letter, complaining about
harassment from external sources and asking for help to stop the disturbances. Breeden sent similar
letters to his congressman and various governmental agencies, who have since contacted Glover
about the irregular correspondence. Like Dr. Lennhoff, Glover noted that Breeden hears noises or
voices, which he believes are inserted into his mind, and has delusional thoughts. 

 Glover also expressed concern regarding Breeden's refusal to take medication, his weight,
and his sleeping habits. Breeden refuses all medication, and this refusal, it appears, is based on his
objection to the use of animals for human drug testing. Breeden's respect for animals also dictates
the parameters of his diet. Breeden, a vegetarian, limits his diet to staples such as rice, beans,
peanuts, fruit juice, and fresh vegetables. Glover was of the opinion that Breeden had lost weight in
the last month. She agreed that there's a probability that Breeden will harm himself if he does not
gain weight or begin eating a different diet. Glover, however, reminded the court on two occasions
that she was not a medical expert. Her concern for Breeden's health was solely based on her personal
observations. She testified that Breeden's nurse said he was forty-six pounds underweight. Breeden's
nurse did not testify at this hearing. Finally, Glover expressed concern for Breeden's sleeping habits,
indicating that he is only able to sleep a few hours a day. She opined that sleep deprivation could
impair his judgment.

 The fifth and final witness to testify for the State was Deputy Rusty Forbes. Recently, Forbes
had the opportunity to observe and talk with Breeden when he transported him to the emergency
room. In general, Forbes's testimony corroborated the other witness testimony regarding
manifestations of Breeden's illness. For example, Forbes testified that Breeden hears popping sounds
and voices, that he has a dislike for or mistrust of electronics, and that he seems to isolate himself
from others. Forbes also testified about Breeden's feelings of kinship with animals, which Forbes
learned prevents Breeden from driving because he does not like the fact that bugs meet their death
on his windshield. Foster previously met and observed Breeden when he accompanied a caseworker
out to his home to investigate a call about an injured animal. An upset Breeden contacted authorities
about a goat badly wounded after getting caught in a fence. 

 On cross-examination, Forbes testified that he did not perceive any way in which Breeden
would be a harm to himself or others. He also indicated that Breeden did not appear to be aggressive. 
 Breeden testified on his own behalf. A self-described vegan vegetarian, Breeden explained
that his choice in diet has grown out of a kinship he feels towards fellow creatures. He testified that
he eats three meals a day, with each meal consisting of "two grains, a legume or a nut serving to
balance the protein -- they're the amino acids, a serving of vegetable, and a serving of fruit." He
indicated that he understood the importance of proper nutrition, and stated that he has never weighed
more than 130 pounds. He currently weighs approximately 120 pounds. Breeden also detailed his
daily routine, which generally includes attending to personal correspondence, business
correspondence, and playing the guitar. He jogs frequently and cleans his house every couple of days. 
 With respect to his lack of social interaction, Breeden explained:

 [t]he solitude at this point, overall, was -- was being (sic) a good thing, I think. I
agree that social interaction is -- is important also. And part of this week and a half
of being confined here against my desire has -- has helped me to see some of the
social [interaction] that I was missing, except I still think that, overall, that the
solitude is at this point a good -- a good place for me.


Breeden further stated that, although isolated, he is able to care for himself. He is able to perform
the activities of daily life such as eating, practicing basic hygiene, and maintaining a clean house. 
Breeden stated that he has never had any thoughts of hurting himself or others. Breeden has not been
employed since August 1998. He is currently receiving Social Security Disability benefits.

 On cross examination, Breeden confirmed that he hears popping noises, that he does not sleep
well, and that he refuses medication out of a respect for animal rights. On redirect examination,
however, he stated that the noises or voices do not impair his ability to make a decision about
whether to submit to treatment.

Application of Law to Facts

 As previously noted, the trial court's order of commitment was based upon the findings that
Breeden is mentally ill and that he will, if not treated, continue to suffer severe and abnormal mental,
emotional, or physical distress, and will continue to experience deterioration of his ability to function
independently and is unable to make a rational and informed decision as to whether or not to submit
to treatment.

 The testifying doctors uniformly agreed that Breeden is mentally ill. The tentative diagnoses
varied in degree but were consistent in identifying Breeden's illness in the spectrum of schizophrenias. 
Breeden confirmed that he hears voices or noises, which he believes may be transmitted to him by
external sources. All the witnesses indicated that Breeden has delusional thoughts. These delusional
thoughts were recently committed to paper, and apparently alarmed all who received a copy of
Breeden's letter. Dr. Lennhoff went so far as to characterize Breeden's thoughts as psychotic in
nature. We find this evidence sufficient to produce in the mind of the fact-finder a firm belief or
conviction that Breeden is mentally ill.

 The doctors also uniformly expressed the opinion that Breeden, if not treated, will continue
to suffer severe and abnormal mental, emotional, or physical distress, and will continue to experience
deterioration of his ability to function independently and is unable to make a rational and informed
decision about whether to submit to treatment. What is lacking from the record, however, is
sufficient evidence of a recent act or a continuing pattern of behavior that tends to confirm these
assertions. See Tex. Health & Safety Code Ann. § 574.034(d)(1), (2) (Vernon Supp. 1999)
(emphasis ours) (to be clear and convincing evidence under this section, record must include evidence
of recent act or continuing pattern of behavior that tends to confirm proposed patient's distress,
deterioration of his ability to function, and his inability to make rational and informed decision as to
whether or not to submit to treatment). The State points to testimony regarding Breeden's weight
loss and refusal of medicine, and argues that such evidence satisfies the statutory requirements
necessary for involuntary commitment. We disagree.

 Breeden's diet and weight were a concern to Drs. Lennhoff and Allawala and Glover,
Breeden's caseworker. As previously noted, the five-foot-seven-inches tall Breeden is a vegetarian
who currently weighs approximately 120 pounds. Both doctors testified that Breeden was not eating
well, and indicated that his poor diet caused him to be a danger to himself. Glover expressed similar
concerns, noting that Breeden appeared to have lost weight over the past few months. Dr. Allawala
also made the blanket assertion that Breeden was underweight. Admittedly, however, the doctors
had no independent knowledge that Breeden was not eating properly or losing weight due to a poor
diet. Both doctors also acknowledged that medical testing did not reveal signs of malnourishment.
Glover stated that Breeden's nurse said he was forty-six pounds underweight; notably, the nurse did
not testify.

 While this is some evidence that Breeden could be underweight, it does not constitute
evidence of a continuing pattern of behavior that demonstrates Breeden's distress or his inability to
function. It is undisputed that Breeden's dietary choices are linked to his concerns for animal rights. 
These concerns, however, which may or may not be born out of his mental illness, have not prevented
him from eating three seemingly well-balanced, albeit lackluster, meals a day at home. Breeden
testified that he understood the importance of proper nutrition. His meals, which generally consist
of two servings of grains, a legume or a nut serving, fruits and vegetables, appear to satisfy basic
nutritional needs. Moreover, Breeden's exercise routine cannot be looked over as a factor that likely
contributes to his slight weight.

 Nor do we find compelling the argument that Breeden's refusal of medication satisfies the
statutory requirements of section 574.034. This court has previously determined that refusal of
medication that results in confusion and disorientation to the patient is insufficient evidence of an
overt act or continuing pattern of behavior that demonstrates the patient's distress and the
deterioration of the patient's ability to function. See In re J.S.C., 812 S.W.2d at 96 (finding
insufficient evidence of overt act or continuing pattern of behavior even where chronic schizophrenic
patient, described as catatonic, delusional, disorientated, and hallucinating, refused medication). 
Other courts have reached similar conclusions despite strong evidence of mental illness. See e.g.,
Johnstone, 961 S.W.2d at 387, 389-90 (reversing commitment order of chronic schizophrenic patient
who refused medication due to religious and cultural reasons because State failed to prove evidence
of overt act or continuing pattern of behavior that demonstrated distress and patient's inability to
function independently); Broussard v. State, 827 S.W.2d 619, 622 (Tex. App.--Corpus Christi 1992,
no writ) (finding no evidence of overt act or continuing pattern of behavior that demonstrated distress
and deterioration of patient's ability to function even though paranoid schizophrenic patient refused
medication because she believed it was poisonous). The same conclusion is appropriate in the instant
case. Here, Breeden's refusal of medication, like his choice in diet, is based upon his deeply-felt
concern for animal rights. This refusal of medication demonstrates not his distress or deterioration
of his ability to function, but rather speaks to his ability to make a rational and informed choice about
whether to submit to treatment. See Broussard, 827 S.W.2d at 622. 

 The State's reliance on both Mezick v. State, 920 S.W.2d 427 (Tex. App.--Houston [1st
Dist.] 1996, no writ) and Johnson v. State, 693 S.W.2d 559 (Tex. App.--San Antonio 1985, no writ)
does not change our conclusion. In Mezick, an insufficiency argument was rejected in the face of
evidence that the proposed patient not only refused medication and had lost considerable weight in
the months immediately preceding commitment, but had a history of manic behavior that had led to
her frequent hospitalization. Mezick, 920 S.W.2d at 430-31.

 In Johnson, this court reasoned that an individual who cannot make a rational decision to
receive treatment poses a threat to his own well being. Johnson, 693 S.W.2d at 663. We do not
quarrel with that sound logic. In place, however, are strict statutory requirements for the drastic
measure of involuntary commitment for mental health services. While the record demonstrates that
Breeden is ill and in need of medical attention, the record fails to contain evidence of a recent overt
act or a continuing pattern of behavior that tends to confirm Breeden's distress and the deterioration
of his ability to function. The trial court's decision is based not on the fact that Breeden posed a harm
to himself, but rather that Breeden, if not treated, will continue to suffer severe and abnormal mental,
emotional, or physical distress, and will continue to experience deterioration of his ability to function
independently and is unable to make a rational and informed decision as to whether or not to submit
to treatment. Because the record does not contain sufficient evidence of a recent act or a continuing
pattern of behavior that tends to confirm these assertions, we sustain point of error number one. See
Tex. Health & Safety Code Ann. § 574.034(d)(1), (2) (Vernon Supp. 1999).

 In light of our treatment of point of error number one, we need not address Breeden's
constitutional challenge with regard to the commitment order. See Tex. R. App. P. 47.1. We also
need not review the propriety of the order authorizing psychoactive medication. A trial court may
not issue an order authorizing the administration of psychoactive medication unless the patient is
under an order for temporary or extended mental health services. See Tex. Health & Safety Code
Ann. § 574.106(a)(1) (Vernon Supp. 1999). Because its authorizing order is reversed by this
opinion, the order authorizing psychoactive medication cannot stand. See id.

 The orders of the trial court are vacated. 


 Catherine Stone, Justice

PUBLISH

1. On April 15, 1999, Breeden was released from Kerrville State Hospital. Although Breeden is no longer
subject to the trial court's orders, this appeal is not moot. See Lodge v. State, 608 S.W.2d 910, 911 (Tex. 1980). In
Lodge, the Supreme Court held that the doctrine of mootness does not apply to appeals from involuntary commitments
for temporary hospitalization. Lodge, 608 S.W.2d at 911-12. This conclusion was based, in part, on the observation
that "commitment to a mental hospital 'can engender adverse social consequences to the individual' whether it is
labeled a 'stigma' or if it is called something else." Id. at 912. This stigma continues even after release is obtained. 
See id.

 
2. We note that the trial court's commitment order tracks the language of the former version of section
574.034(a)(2)(C). In 1997, subsection (a)(2)(C) was modified to explain that a patient's inability to function
independently may be demonstrated by the patient's inability to provide basic needs of food, clothing, health, or safety. 
Aside from that edifying language and other minor semantic changes, the current version of 574.034(a)(2) reads the
same.