Hillsborough-southern judicial district
Nos. 97-161
     97-373

JOHN J. KEATING, ADMINISTRATOR OF THE ESTATE
OF MICHAEL J. KEATING & a.

v.

UNITED INSTRUMENTS, INC. & a.

December 8, 1999

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*W. Michael Dunn* and *Robert R. Lucic* on the brief, and *Mr. Lucic* orally), for plaintiff John J. Keating, administrator of the estate of Michael J. Keating.

*Wadleigh, Starr, Peters, Dunn and Chiesa*, of Manchester (*Robert E. Murphy, Jr.* on the brief) and *Kern and Wooley LLP*, of Irving, Texas (*Don Swaim* on the brief and orally), for defendants United Instruments and Tokyo Aircraft Instruments.

*Dean, Rice & Kane, P.A.*, of Manchester (*Charla Bizios Labbe* on the brief) and *McBreen, McBreen & Kopko*, of Chicago, Illinois (*Hugh G. McBreen* and *Michele Tate McBreen* on the brief, and *Mr. McBreen* orally), for defendant Mooney Aircraft.

THAYER, J. These appeals arise out of a wrongful death action brought by the estates of Michael J. Keating and Karen Maloney following an airplane crash in Brookline. The jury returned a verdict for the defendants, United Instruments (United), Mooney Aircraft (Mooney), and Tokyo Aircraft Instruments (Tokyo). The estate of Maloney did not appeal. The remaining plaintiff, the estate of Keating, appeals a Superior Court (*Dalianis*, J.) ruling excluding evidence pursuant to New Hampshire Rule of Evidence 407. United appeals the trial court's decision granting Mooney relief under its cross-claim against United and Tokyo (referred to collectively as United/Tokyo) for attorney's fees. We affirm.

The parties agree that in 1991, Keating, a flight instructor, and his student, Maloney, set out in an aircraft manufactured by Mooney on an instructional flight. The aircraft utilized a model 5934 altimeter manufactured by United/Tokyo. At the time of the crash, the pilots were practicing stalls and stall recoveries. Due to the force of the impact, much of the aircraft and its component parts, including the altimeter, were destroyed or lost.

## I. Subsequent Remedial Measures

The plaintiff argues that the trial court abused its discretion in excluding evidence of a subsequent remedial measure to impeach the testimony of James Peterson, an FAA investigator, while allowing Peterson to testify to tests of the 5934 altimeter that were conducted after the subsequent remedial measure occurred.

Peterson described the physical characteristics of an altimeter in his testimony.

> An altimeter is a little bit like a mechanical clock. There are shafts, wheels; there are parts that have long shafts, if you will, you can think of it as an axle. There's a wheel attached to it. The axle is held in place by two end plates, one on either end of the axle. The dimensions between the two end plates defines a — an end-play. If the end-play is insuffi-cient, . . . there's friction added to this very delicate mechanism, and there may be lag or hysteresis in the operation of the instrument.

Prior to 1992, United/Tokyo set the end-play by sight and feel. After 1992, the end-play was set by a measuring device called a jig. The model 5934 altimeter in the plane at the time of the crash was manufactured in 1988, well before the introduction of the jig into the manufacturing process. Pursuant to New Hampshire Rule of Evi-dence 407, the trial court excluded evidence of the jig as a subsequent remedial measure.

Peterson testified about a series of tests performed on model 5934 in response to concerns raised, beginning in 1989, by an altimeter repair person, William Magagnos. Some of the testimony concerned specific tests that Peterson or others conducted beginning in 1993. Some of Peterson's testimony concerned tests done after 1993, but on altimeters that were modified by someone other than Unit-ed/Tokyo or were manufactured before the introduction of the jig. Finally, some of Peterson's testimony involved summaries of FAA investigations begun in 1989 and concluding sometime after 1993. The results of all of these tests reflected that the altimeter met the requirements of the technical standard order (TSO), which assures that the altimeter's design meets the minimum requirements of the Federal Aviation Regulations, and that the concerns raised by Magagnos were unjustified.

According to the plaintiff, Peterson's testimony misled the jury because evidence of the jig was excluded, but the tests that were conducted by the FAA concerned altimeters whose end-plays were set by the jig. Under New Hampshire Rule of Evidence 407, evidence of subsequent remedial measures is inadmissible "to prove negligence or culpable conduct in connection with the event." Such evidence is admissible, however, "when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." N.H. R. EV. 407. We have never directly ruled on the proper use of subsequent remedial

measures for impeachment purposes. In *Cyr v. J.I. Case Co.*, 139 N.H. 193, 652 A.2d 685 (1994), however, we observed that courts must be careful not to allow this exception to swallow the general rule against introduction of subsequent remedial measures, *see Cyr*, 139 N.H. at 207, 652 A.2d at 694, "since any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony," *Kelly v. Crown Equipment Co.*, 970 F.2d 1273, 1278 (3d Cir. 1992). Other courts have allowed subsequent remedial measures to impeach a defendant who has testified that the product in question is designed to be the safest or the best. *See, e.g., Kelly*, 970 F.2d at 1278; *Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309, 1313-14 (5th Cir. 1985). In those cases, subsequent remedial measures were used to impeach the allegation that the product at the time of the incident was the safest or the best that it could be. *See Muzyka*, 774 F.2d at 1313-14.

Such is not the case here. Peterson did not testify that the best or safest way to set the end-play was by feel and sight. Rather, he testified that a series of FAA investigations from 1989 until 1993 had not changed the FAA's conclusion that the altimeter passed the TSO test. Evidence of the 1992 introduction of the jig into the manufacturing process would not have shown that the introduction of the jig changed the opinion of the FAA about the safety of the altimeter. Moreover, the plaintiff introduced evidence from his own witnesses that the end-play of certain altimeters was not always set correctly. *Cf. Gardner v. Chevron U.S.A., Inc.*, 675 F.2d 658, 660 (5th Cir. 1982) (because jury heard evidence similar to the evidence trial court declined to admit, any error was harmless). Additionally, Peterson's own testimony did not contradict the plaintiff's claim that the setting of the end-play could be done incorrectly. In fact, he testified that "[o]ne of the most common causes of an overhauled altimeter not operating correctly is end-play has not been properly set. It's a difficult, tedious, craftsmanship-like job." Because the evidence offered by the plaintiff would not have directly impeached any of Peterson's testimony, we conclude that the trial court did not abuse its discretion in excluding it.

The plaintiff also appeals the trial court's exclusion of the report of another FAA investigator, Mr. Lundquist, which concluded that the model 5934 altimeter was not safe. The plaintiff contends that this exclusion left the jury with the erroneous impression, from Peterson's testimony, that the FAA uniformly found the altimeter to be safe. The trial court initially ruled that the report was inadmissible under the public records exception to the hearsay rule, N.H. R.

EV. 803(8), because the FAA had never adopted the report. The court deferred deciding whether it was admissible under the catch-all hearsay exception of New Hampshire Rule of Evidence 803(24) until a *voir dire* of Lundquist occurred. In a later decision, the court stated that "[t]he Court has previously ruled that the Lundquist report is inadmissible as a subsequent remedial measure. Moreover, the report has not been authenticated, and contains hearsay statements." Although the plaintiff contends the trial court abused its discretion in excluding the report, he does not demonstrate how it erred in finding that the report was hearsay, unauthenticated, and involved subsequent remedial measures. *See* SUP. CT. R. 16(3)(f). Therefore, we will not address the issue.

## II. Indemnification and Defense Agreement

The model 5934 altimeter in the aircraft at the time of the crash was purchased by Mooney from United/Tokyo. The purchase order contained an indemnification and defense provision which states, in pertinent part:

> [United/Tokyo] shall indemnify for and hold [Mooney] harmless from all liability, loss, damage, and or expense, (including all attorney's fees and costs of investigating and litigating claims) due to injuries to persons (including death) and/or damage to or destruction to property resulting, directly or indirectly, from acts or omissions of [United/Tokyo], its employees, agents, or suppliers in the manufacture, construction, sale, use, delivery, installation and/or servicing of the [altimeters] or otherwise in the performance of this order . . . . [United/Tokyo] agrees to promptly assume the defense and preparation for the defense (and costs therefor) of any suit or threatened suit brought against [Mooney] . . . .

United/Tokyo argues that the trial court erred in ruling that this indemnification and defense provision covered the suit by the plaintiff and the estate of Maloney (hereinafter, the plaintiffs) against Mooney for three reasons. First, United/Tokyo contends that the plaintiffs' lawsuit alleged Mooney's independent negligence for which the indemnification and defense provision provided no coverage. Second, United/Tokyo argues that the trial court erred in applying the law of New Hampshire rather than the law of Texas. Finally, United/Tokyo argues that the indemnification and defense provision is not applicable because the jury returned a defense verdict.

In its first argument, United/Tokyo contends that a substantial part of the plaintiffs' case concerned Mooney's independent negligence, unrelated to the altimeter, and that the parties' agreement did not obligate United/Tokyo to indemnify or defend Mooney for Mooney's own negligence.

■ In support of its argument, United/Tokyo relies on the declaration of the writ of summons and the testimony of Edwin Penney. According to United/Tokyo, the writ of summons contained claims against Mooney for Mooney's independent negligence. United/Tokyo failed, however, to provide this court with a copy of the writ of summons. Pursuant to Supreme Court Rule 13(3), "[t]he moving party [is] responsible for presenting to the supreme court a record sufficient for the court to decide the questions of law presented by the case." Because United/Tokyo failed to provide us with the writ, we do not consider this argument. *See Cook v. CIGNA Ins. Co.*, 139 N.H. 486, 488, 657 A.2d 834, 835 (1995).

United/Tokyo also contends that Penny's testimony was evidence of Mooney's independent negligence. Penny's testimony concerned whether Mooney granted permission to Daniel Webster College to reprint certain sections of a pilot operating handbook without including two sections that involved minimum altitudes for stall recovery and slow-flight maneuvers. United/Tokyo first refers us to the following testimony, in which the plaintiffs' attorney questions Penney:

Q. You're not denying that Mr. Teller got permission from somebody at Mooney, to, to reprint that manual, without Sections IX and X.

A. That is what he testified to.

Q. Well, and you're not denying it, because you don't know who he might have contacted.

A. I can't deny or say it's correct.

Q. All right. Assuming that he did get permission to reprint the manual without Section IX and X, is it your position that Mooney would be negligent for granting permission to reprint without Sections IX and X?

A. Yes, if that was the case. But as I understand it, he said he obtained permission to reprint the manual, but didn't specify what sections he was going to leave out. That's to my understanding, sir.

Q. Well, — but in answer to my question, it is your position that if he did obtain permission from Mooney to reprint that manual without Sections IX and X in it, then that would be negligence on the part of Mooney.

A. If he, in fact, did obtain that permission, yes, sir.

We conclude that these four questions regarding Mooney's possible independent negligence do not, by themselves, constitute evidence of negligence.

In its brief, United/Tokyo also refers to "substantial evidence" consisting of "additional testimony at trial" relating to the altitude at which the aircraft was operating before it crashed. According to United/Tokyo, this testimony would also tend to establish the independent negligence of Mooney rather than the fault of the altimeter. United/Tokyo fails, however, to indicate the location of this testimony in the record as required by Supreme Court Rule 16(9). The court has before it only a portion of the transcript of the three-week trial, amounting to approximately 740 pages. The court cannot ascertain if there was, in fact, any additional testimony to support the contention that the trial involved Mooney's independent negligence or even whether that testimony is contained in the transcript provided.

■ The trial court ruled that because "the sole issue in this complex litigation, as borne out at trial, was whether [United/Tokyo] and/or Mooney were negligent or strictly liable in connection with the altimeter, [United/Tokyo]'s argument that it is not obligated to pay for costs associated with Mooney's alleged negligence is without merit." The court later stated that "[t]he vast majority of the evidence at trial related solely to [United/Tokyo]'s alleged strict liability" and that "[a]ny evidence presented with respect to Mooney's alleged [independent] negligence, and any trial preparation thereto, was minimal and totally intertwined and interdependent upon the evidence related to [United/Tokyo]." The trial court had the opportunity to observe the entire trial and had before it all of the evidence. We are unwilling to say, based on the sparse record provided by United/Tokyo, that the trial court erred. Accordingly, we need not decide whether the indemnity provision would have required United/Tokyo to defend Mooney for Mooney's own negligence.

United/Tokyo's second argument is that the trial court erred in applying New Hampshire law to determine the enforceability of the indemnification and defense agreement. Because we conclude that

the trial court was correct in ruling that application of the law of Texas, Kansas, and New Hampshire would render the same result as to the indemnification and defense agreement, we need not determine which law should have been applied. *See LaBounty v. American Insurance Co.*, 122 N.H. 738, 744, 451 A.2d 161, 164 (1982).

Indemnification agreements in all three jurisdictions are interpreted as contracts. *See Bartlett v. Davis Corp.*, 547 P.2d 800, 807 (Kan. 1976); *Commercial Union Assurance Co. v. Brown Co.*, 120 N.H. 620, 623, 419 A.2d 1111, 1113 (1980); *Associated Indem. Corp. v. Cat Contracting*, 964 S.W.2d 276, 284 (Tex. 1998). The language of the contract, the facts and circumstances surrounding it, and the intent of the parties are considered. *See Bartlett*, 547 P.2d at 807; *Commercial Union Assurance Co.*, 120 N.H. at 623, 419 A.2d at 1113; *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518-19 (Tex. 1968).

■ It is true, as United/Tokyo contends, that each of these States has different requirements for construing indemnification agreements as they relate to the indemnitee's own negligence. *See, e.g., Bartlett*, 547 P.2d at 808 (indemnification agreement need not contain express language covering owner's negligence); *Merrimack School Dist. v. Nat'l School Bus Serv.*, 140 N.H. 9, 12, 661 A.2d 1197, 1199 (1995) (express language is not necessary where parties' intent to indemnify negligence of another is clearly evident); *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 706 (Tex. 1987) (express language required for indemnification agreement to cover indemnitee's own negligence). In light of our conclusion that the lawsuit did not involve Mooney's independent negligence, however, these distinctions are irrelevant to this case. Therefore, we hold that the trial court did not err in applying New Hampshire law in interpreting the indemnification and defense agreement.

■ Finally, United/Tokyo contends that because the jury returned a defense verdict, the indemnification and defense provision is not applicable. Under New Hampshire law, "[a]s a general rule, the proper interpretation of a contract is ultimately a question of law for this court, and we will determine the meaning of the contract based on the meaning that would be attached to it by reasonable persons." *Galloway v. Chicago-Soft*, 142 N.H. 752, 756, 713 A.2d 982, 984 (1998) (quotation omitted). The contractual provision in question contemplates both indemnification and defense against suit. The first part of the indemnification and defense provision addresses liability for a possible verdict against Mooney because of United/Tokyo's altimeter. As discussed above, the underlying suit in this

case concerned the altimeter provided by United/Tokyo. Because United/Tokyo and Mooney received a defense verdict, there was no judgment against Mooney requiring United/Tokyo to provide indemnification. The second part of the indemnification and defense provision, however, required United/Tokyo to assume Mooney's "defense and preparation for the defense (and costs therefor) of any suit or threatened suit brought against [Mooney]." This language is not contingent upon a verdict against Mooney and United/Tokyo. Having found that United/Tokyo has failed on appeal to demonstrate that any issue other than the altimeter was substantially at issue in the trial, we need not consider United/Tokyo's argument that it is not responsible for Mooney's defense against unrelated claims. The trial court was therefore correct in ruling that the indemnification agreement required United/Tokyo to pay Mooney's costs in defending the lawsuit.

*Affirmed.*

BRODERICK, J., did not sit; the others concurred.