Reversed and Rendered and Opinion filed July 25, 2002









Reversed and Rendered and Opinion filed July 25, 2002.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

Nos. 14-01-00055-CV

 

____________

 

FLOATING BULK TERMINAL, L.L.C. and
ECONO-RAIL CORPORATION,
Appellants/Cross-Appellees

 

V.

 

COAL LOGISTICS CORPORATION, J.
PATRICK DOWD, and

LILLIAN MOORE DOWD, Appellees/Cross-Appellants

 



 

On Appeal from the 61st District Court

Harris County, Texas

Trial Court Cause No. 98-08965

 



 

O P I N I O N








A jury found that Econo-Rail Corporation breached an
agreement to own a ship jointly with Coal Logistics Corporation.[1]  It awarded $70,000 in past damages and
$2,000,000 in future damages on the breach of contract claim.  The jury also found that Econo-Rail breached
a fiduciary duty to Coal Logistics, but did not enter a damages finding on this
claim.  However, the jury did award
attorneys’ fees.  The trial court
rendered judgment on the verdict, awarded pre- and post-judgment interest on
the past damages, post-judgment interest on the future damages, and attorneys’
fees.  We reverse and render judgment
that Coal Logistics take nothing because we conclude there is no evidence the
parties agreed on the essential terms necessary to create an enforceable
contract.

FACTUAL AND PROCEDURAL BACKGROUND

In October 1997, Patrick Dowd, president of Coal Logistics,
learned of an opportunity to buy a self-unloading cargo vessel.  On October 17, Dowd executed a memorandum of
agreement to purchase the ship for $2.1 million.  But, the agreement required a 10 percent
deposit within five banking days (by October 24).  Payment in full was due at the time of
delivery, expected to be between November 17 and November 21, 1997.  If Dowd did not pay the purchase price as
provided in the agreement, the sellers had the right to cancel the agreement;
the deposit, together with interest earned, would be released to the sellers.

Dowd approached William (“Bill”) Scott about joint investment
and co-ownership.  Bill and his brother
controlled a group of companies, among them Beaumont Bulk Terminals, Inc. (“BBT”),
and Econo-Rail.[2]


Dowd and Bill Scott met in Texas on October 22.  The next evening, Dowd drafted a contract,
which provided in part:

1) [Coal Logistics] hereby assigns all its rights and
obligations under the Vessel Purchase Contract to the BBT Group.

2) In consideration, a 33 percent interest in the new
vessel[-]owning company shall be granted to [Coal Logistics].  Said minority interest shall be deemed to
have been earned upon [Coal Logistics]’s payment of our one-third of the
$210,000 (US) cash payment due on October 24th as the initial ten percent down
payment under the Vessel Purchase Contract.








 

Dowd’s proposed contract also contained a buy-out provision that would
have allowed BBT, between July and December of 1998, to acquire Coal Logistics’s
33 percent interest for what appears to be $500,000.

On October 24, Coal Logistics assigned BBT its interest in
the memorandum agreement.  The $210,000
was also deposited, with Coal Logistics contributing $70,000.

The same day, the parties began to disagree about the terms
of their agreement.  BBT’s attorney,
Craig Cavalier, drafted an agreement modifying the terms in Dowd=s proposed draft.  Cavalier’s draft provided the following in
part:

1.         [Coal Logistics] has assigned all it’s [sic] rights and
obligations under The Vessel Purchase Contract to The BBT Group.  The BBT Group through a wholly owned
subsidiary (hereafter “Newco”) . . . will acquire title to the vessel free and
clear of all liens, claims and encumbrances.

2.         In consideration of the foregoing, [Coal Logistics] will
acquire a 33 percent interest in Newco subject to the terms and conditions set
forth herein.  Said minority interest
shall be earned upon [Coal Logistics]’s payment of one third (a) of the $210,000 (US) cash payment due on October 24
as the initial ten percent down payment under the Vessel Purchase Contract and
[Coal Logistics]’s execution of those documents necessary to evidence its
proportionate responsibility for the financed portion of the purchase price and
other anticipated costs associated with putting the vessel back in
service.  (Emphasis added.)  

 

Cavalier’s draft also reduced the buy-out option to $200,000.

Four days later, Dowd returned a marked-up copy of the
Cavalier draft.  Dowd marked out the
language requiring Coal Logistics to pay for its proportionate share of the
purchase price and the refitting costs. 
The revamped draft contract looked like this:








Said minority interest shall be earned upon [Coal
Logistics]’s payment of one third (a) of the
$210,000 (US) cash payment due on October 24 as the initial ten percent down
payment under the Vessel Purchase Contract and [Coal Logistic]’s execution of
those documents necessary to effect purchase of the vessel.

 

Dowd also deleted a portion requiring joint responsibility for insurance
and added a provision requiring BBT to provide insurance.  The buy-out amount was changed from $200,000
to $300,000.

Floating Bulk Terminal (“FBT”) was created November 1, 1997,
with Econo-Rail as its sole owner.  On
November 17, FBT closed on the purchase of the ship.  Econo-Rail funded the remainder of the
purchase price through a previously established line of credit.

During November and December, Econo-Rail spent over two
million dollars to get the ship into operating condition.  On December 31, Econo-Rail=s chief financial officer, Dan
Orsini, wrote Dowd complaining, “All amounts other than the $70,000 of the
original down payment have been made or advanced by or on behalf of Econo-Rail
Corporation. . . .  Based upon our
calculations, Econo-Rail has approximately $2.5 million dollars in the project
as compared to the $70,000 that was originally advanced by Coal Logistics
Corporation.”  Orsini let Dowd know what
Econo-Rail expected Coal Logistics to do at that point:

Any flexibility regarding operation of the vessel on a
going forward basis . . . is somewhat dependent upon the willingness of Coal
Logistics Corporation to advance necessary funds.  Interim financing for the vessel was obtained
by utilizing Econo-Rail=s credit and the vessel is yet to be permanently
financed.  You will need to make
arrangements for your portion of the financing as well as for repayment of your
proportionate share of the advances made to date and for your share of the
necessary reserve of operating funds once the vessel has been placed in
service.

 








On January 1, 1998, Dowd responded to Scott, “Coal Logistics
Corporation lodged its one third of the deposit and assigned the vessel
purchase contract to you, and your assigns, with the understanding that you
would finance the vessel purchase with the unabridged rights to pledge the
vessel as security.  Through that
agreement, we became a one-third owner of the vessel, and your group a
two-thirds owner.”  Dowd continued, “Our
group has put up $70,000, our one third portion of the vessel purchase deposit,
and I have told both of you on more than one occasion that we are prepared to
put up additional $100,000, bringing our cash investment to $170,000, which
approximates our share of the start-up costs.” 
Dowd complained about having Ano documentation from you, no stock
issued in our designee=s name, and a fair amount of ‘reservations,’ ‘concerns,’ ‘worries,’
and allegations expressed by you.”

On January 8, Scott responded to Dowd, stating, “There is no
agreement between the parties today and we have put up all the necessary funds
to date, with the exception of the $70,000 you put up as earnest money, on the
vessel.  Everything else has been
conversation.  Our position is simply
that if you want 33 percent of the vessel, then put up 33 percent of the vessel
cost.”  Scott set forth specific details:

We are prepared to follow through with the original b;a ownership arrangement, assuming you agree for BBT to
have a $200,000 buy-out option on the vessel. 
What you and your partners need to do is to finance your share of the
vessel purchase and refitting cost and come to the table with the ability to
contribute the necessary funds to complete the refit and capital improvements
necessary to trade the vessel successfully.

Pat, at no time in our discussions did you say to BBT
that you wanted 33 percent of the vessel but you are unwilling to fund your 33
percent of the purchase price and refitting cost.  The opposite is actually true.  The temporary financing which BBT has
arranged will terminate in early February, 1998.  You have 30-days to fund a 33 percent portion
of the purchase price for the vessel.  As
a minority share holder you must recognize your position in such a venture and
know that BBT or its assigns shall operate the vessel based solely on our
judgement of what is the best employment for the vessel.  We suggest you seek legal council [sic] to
clarify your rights.  Further, if you
wish we will refund . . . the $70,000 you contributed and pay you $100,000 to
walk away.  This offer is good until 15
January 1998[;] it will not be repeated.

 








Dowd answered on February 4. 
He offered a proposal for future employment of the ship, but did not
discuss whether Coal Logistics would pay its share of the costs.  Dowd also referred to the joint
ownership:  “This old lady isn’t going to
sail forever, so if we both choose to go down this road, we do it together
(with b and a ownership as previously agreed) for
the remaining life of the ship.  The full
capitalized cost of the vessel will be recognized by the partnership B no writedown.”

On February 19, Scott wrote Dowd:

Coal Logistics has not funded any portion of the operating
or refit costs and has not provided it=s [sic]
share of the financing for the vessel purchase. 
You were given notice that BBT was calling for your participation in the
financing and funding of the refit.  You
still have not seen fit to participate in the funding.

 

Scott explained BBT was considering scrapping the ship or spending an
additional $1.5 million to make the ship economically viable to trade.  Scott added, “We need to know immediately
your intention regarding funding your share of the costs.”

On February 23, Dowd replied, “Our group has and is entitled
to a one-third ownership interest in the [ship] ‘NITA M.’  We are prepared to invest furthur [sic] in
the vessel because we believe in its economic viability and earning potential.”  Dowd then expressed a lack of confidence in
FBT’s willingness to treat his group fairly and openly.  Dowd complained of not having received stock,
documentation regarding financing, or invoices for repairs.  He also complained FBT was not employing the
ship economically.  Finally, he requested
“an accounting of the venture to date, any revised capital structure you wish
us to consider, the debt financing you think most prudent for the venture,
vessel management plans and the employment you think would be most suited for
the vessel.”  The correspondence
contained no promise of any money.

On February 26, Econo-Rail filed a declaratory judgment
action asking for dissolution of FBT or, alternatively, requesting a judicial
dissolution.  Coal Logistics, Patrick
Dowd, Lillian Dowd, and one other individual were named defendants.








In a March 17 letter, FBT’s counsel, Craig Cavalier, advised
Dowd of the lawsuit.  Cavalier also
wrote, “With respect to your February 23rd correspondence, you once again have
failed to directly respond to our request for funding of your shares of costs
and expenses of the vessel.  The entire
purchase price was paid by Econo-Rail Corp. 
Notwithstanding any other funds that may have been expended you have
failed and refused to advance the balance of one-third (a) of the purchase price.”  Cavalier emphasized, “I have indicated since
the beginning of this dispute that Econo-Rail did not finance the vessel but
elected to pay cash for the vessel and that your one-third (a) share was due.”

In response, the Coal Logistics Group sued FBT, Econo-Rail,
Bill Scott, Richard Scott, and Orsini alleging breach of duty of good faith and
fair dealing, fraud, breach of contract, and numerous other claims.  The case went to trial with the Coal
Logistics Group as plaintiffs and FBT and Econo-Rail as defendants.  The court charged the jury on breach of
contract and breach of fiduciary duty.

The court submitted the following liability questions on
breach of contract:  (1) did Econo-Rail
and Coal Logistics agree that the Coal Logistics Group and the Econo-Rail Group
would own the vessel together; (2) what percentage did Econo-Rail and the Coal
Logistics Group agree they would each own in the vessel; and (3) did Econo-Rail
Corporation fail to comply with the agreement? 
The jury answered “yes,” to question 1; allotted 33 percent ownership to
Coal Logistics and 67 percent ownership to Econo-Rail in question 2; and
answered “yes,” to question 3.  The jury
then found $70,000 past damages and $2,000,000 future damages for the breach of
contract.  Finally, the jury found that
Coal Logistics had breached a fiduciary duty to Econo-Rail but did not award
damages on this claim.








The trial court rendered judgment on the verdict and
initially awarded the Coal Logistics Group prejudgment interest on total damages
of $2,070,000.  By an amended judgment,
the court awarded prejudgment interest on only the $70,000 past damages.  The judgment recites, “[T]he Coal Logistics
group elected to recover under its contract claim along with interest and
attorneys’ fees related thereto[.]  This
election was made without waiving Plaintiffs’ right to seek recovery on the
alternative finding on breach of fiduciary duty and the equitable relief
granted by the Court if the contract award is reversed on appeal[.]”[3]  Both sides perfected an appeal.




DISCUSSION

Introduction

Econo-Rail presents the following four issues: (1) whether
the finding of an oral agreement to “own the vessel together” is sufficient to
support a judgment for breach of contract when the parties were unable to agree
on the essential terms; (2) whether the trial court erred in refusing to apply,
or to submit a jury question on, the statute of frauds; (3) whether the
evidence was sufficient to support the award of damages when the plaintiff=s only expert was not qualified and
did not supply an expert report on damages until the day he testified; and (4)
whether Coal Logistics proved there was a confidential relationship with
Econo-Rail.  The Coal Logistics Group presents
the following issue:  whether the trial
court should have awarded prejudgment interest on the future damages.  As we explain below, we agree with Econo-Rail
that the jury’s answer to question one does not support a breach of contract
claim.  Given our resolution of issue
one, we need not decide Econo-Rail=s remaining issues or the Coal
Logistic Group’s sole issue.[4]




Does the Parties’ General Agreement to Own the Vessel Together

Fail for Lack of Agreement on Essential Terms?

 








In issue one, Econo-Rail argues there was no binding contract
as a matter of law because the parties had not resolved the essential terms of
the contract.  However, before we reach
that issue, we must address Coal Logistics’s initial argument that Econo-Rail
did not preserve the issue for appellate review.[5]

Preservation of Error

To raise a no evidence issue on appeal, the appellant must
have done one of the following in the trial court:  (1) filed a motion for directed verdict; (2)
filed a motion for judgment notwithstanding the verdict; (3) lodged an
objection to the submission of the question to the jury; (4) filed a motion to
disregard the jury’s answer to a vital fact question;  or (5) filed a motion for new trial.  United Parcel Serv., Inc. v. Tasdemiroglu,
25 S.W.3d 914, 916 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied) (citing Cecil v. Smith, 804 S.W.2d 509, 510B11 (Tex. 1991)).  Econo-Rail moved for a directed verdict at
the close of the plaintiffs’ case.  It
argued the following:

[T]here has . . . been no legally sufficient evidence
to prove that the parties reached an agreement to all the essential terms of
the contract.  The only evidence they
presented that has been B the parties agreed to was a one-third/two thirds
split.  Outside of that, there=s no evidence that they agreed to the rest of the
terms we=ve been hearing evidence about.

 

The court denied the motion. 
Econo-Rail renewed the motion at the close of evidence. The trial court
again denied the motion.

Econo-Rail also objected to jury question one, arguing that
the question asked only about ownership and did not establish the rights of the
parties.  Additionally, Econo-Rail
requested the following question: “Did Econo-Rail and Coal Logistics agree that
Coal Logistics Group and Econo-Rail would purchase, own, and operate the vessel
one-third and two-thirds together as partners.@ 
The court overruled the objection and denied Econo-Rail’s request.








Econo-Rail again raised its no evidence issue after the
verdict.  It requested a new trial,
alleging that the evidence was legally insufficient to support the breach of
contract claim, and in a later motion argued in the alternative for a JNOV or
new trial.  Finally, in a post-judgment
motion filed May 9, 2001, Econo-Rail argued that the jury=s responses to the breach-of-contract
questions were supported by legally and factually insufficient evidence and
were immaterial.  Each of these motions
preserved the issue for review.

The Merits of Econo-Rail=s Issue One

Standard of review.  In conducting
a “no evidence” or legal insufficiency review, we must consider all the
evidence in the light most favorable to Coal Logistics, indulging every
reasonable inference in favor of the court’s determination that there is some
evidence to support its claim.  See
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285‑86
(Tex. 1998).  We will sustain a legal
insufficiency point when (a) there is a complete absence of evidence of a vital
fact, (b) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact, (c) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (d) the evidence
conclusively establishes the opposite of a vital fact.  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).  As
discussed below, the issue here is whether there is a complete absence of
evidence of a vital fact, specifically, whether there is any evidence showing
that the parties’ agreement contained the essential terms to make the agreement
enforceable. 








No evidence of essential terms and therefore no
enforceable contract.  To be enforceable, a contract must
sufficiently define all its essential terms to allow the court to determine the
obligations of the parties.  Mabon
Ltd. v. Afri‑Carib Enters., Inc., 29 S.W.3d 291, 300 (Tex. App.CHouston [14th Dist.] 2000, no
pet.).  If an alleged agreement is so
indefinite as to make it impossible for a court to fix the legal rights and
obligations of the parties, it is not an enforceable contract.  This means that the essential terms of the
contract must be agreed upon.  When an
essential term is open for future negotiation, there is no binding
contract.  T. O. Stanley Boot Co. v.
Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992).  Finally, each contract should be considered
separately to determine its material terms. Id.

Here, the parties were purchasing a ship for $2.1 million,
with much additional work needed to make it seaworthy.  The parties left out several essential terms
from their agreement.  We do not know (1)
the division for the remainder of the purchase price, (2) the division of
profits, (3) the division of operating costs, or (4) the division of refitting
costs (which exceeded $2 million).  The
only things we know are how much each party was to contribute for the down
payment (which was only 10% of the cost of the ship) and the division of
ownership, b B a. 
Were we to conclude that the parties wanted to split these other costs
and obligations b B a, that would be only an assumption on our part.  Moreover, the parties’ correspondence makes
it clear that this assumption would be wrong. 
In that correspondence, Coal Logistics declined to discuss taking any
additional responsibility for financing or costs.  Simply put, we have no essential terms to
spell out how we would enforce each of the parties’ rights; their rights and
liabilities are not contained in the agreement. 
Thus, the agreement fails for indefiniteness.  See T. O. Stanley Boot Co., Inc., 847
S.W.2d at 222.[6]

Matter of Law or Question of Fact. 
Anticipating this holding and citing to Scott v. Ingle Brothers
Pacific, Inc., Coal Logistics argues that the question of whether the
parties reached an agreement is an issue of fact.  489 S.W.2d 554 (Tex. 1972).  Here, no one disputes that the parties agreed
to a b B a joint ownership (the only contract
questions submitted to the jury) and agreed to divide the down payment b B a. 
The problem is, those are virtually the only terms they agreed to.  Consequently, the question here is whether
those terms comprise all the essential terms for a binding contract.  That questionCwhether an agreement has all the
essential terms to be an enforceable contractCis a question of law.  See America’s Favorite Chicken Co.
v. Samaras, 929 S.W.2d 617, 622 (Tex. App.CSan Antonio 1996, writ denied); see
also McCreary v. Bay Area Bank & Trust, 68 S.W.3d 727, 733 (Tex. App.CHouston [14th Dist.]  2001, pet. dism’d) (stating question whether
deposit contract is legally enforceable or binding is question of law); Gaede
v. SK Invs., Inc., 38 S.W.3d 753, 757 (Tex. App.CHouston [14th Dist.]  2001, pet. denied) (stating whether agreement
constitutes valid contract generally is legal determination for court); Ronin
v. Lerner, 7 S.W.3d 883, 886 (Tex. App.CHouston [1st Dist.] 1999, no pet.)
(stating whether agreement is legally enforceable is question of law).  That question was not before the Scott
court.

On the other hand, deciding what additional, non-essential
terms an already enforceable contract has or deciding whether mutual assent to
an implied contract exists are fact issues. 
See America=s Favorite Chicken Co., 929 S.W.2d at 625 (contrasting factual question of whether
agreement existed with legal question of whether existing agreement comprised
all essential terms).  The cases cited to
us by Coal Logistics all involve this second scenario.  See, e.g., Scott, 489 S.W.2d at
555; City of Houston v. First City, 827 S.W.2d 462, 473 (Tex. App.CHouston [1st Dist.] 1992, writ
denied); Emmer v. Philips Petroleum Co., 668 S.W.2d 487, 490B91 (Tex. App.CAmarillo 1984, no writ); Indust.
Disposal Supply Co. v. Perryman Bros. Trash Serv., Inc., 664 S.W.2d 756,
765 (Tex. App.CSan Antonio 1983, writ ref’d.
n.r.e.).  The issue in Scott and
the other cases was whether the parties reached an agreement.  We do not dispute the holdings in these
cases; they are simply irrelevant here.

 “Performance.” 
As a final attempt to argue that the issues in this case are fact
issues, Coal Logistics contends courts of appeals have “consistently followed
[the] directive to more readily find intent to be bound by a preliminary
agreement when . . . substantial performance has been rendered or material
action has been taken in reliance upon existing expressions of agreement.”  Coal Logistics cites two cases in support of
its substantial performance argument.  Of
these, only Hardin Construction Group, Inc. v. Strictly Painting, Inc.,
arguably links performance to the question of whether the agreement encompassed
all essential terms. 945 S.W.2d 308, 313 (Tex. App.CSan Antonio 1997, orig. proceeding
[leave denied]).  

But, as with the other cases Coal Logistics cites, this case
also is irrelevant because, as analyzed by the court, it involved an implied
contract.  See id. at 310
(referring to letter in which Strictly Painting implicitly agreed to all but
one term).  The implied contract already
had all the essential terms; the substantial performance merely confirmed that
the performing party intended to be bound by the contract it failed to sign.

Moreover, there are several noteworthy facts in Hardin
that we do not have here.  The parties
had previously entered into several signed contracts exactly like the one in Hardin,
except for one disputed term that was added to the unsigned contract underlying
the litigation.  The prior relationship
and the unsigned, but similar, contract exchanged between the parties gave
specific meaning to the one party’s performance.  As a consequence, the court=s language that one party’s
performance helped determine whether a term was essential or not, must be
viewed in light of these facts; they narrow the application of this
language.       Here, there was no implied contract; there was no contract at
all.  We have only two essential terms,
and they relate only to the proportional ownership and division of the down
payment.

In summary, we conclude that the “agreement” here was
unenforceable  because the parties did not
agree on the essential terms.

We sustain Econo-Rail=s issue one.

Is Rendition on the Alternative Theory of Recovery
Appropriate?

The trial court’s judgment incorporated the jury’s verdict
for all purposes.  Answering question
four, the jury found a relationship of trust and confidence existed between
Coal Logistics and Econo-Rail.  The jury
answered, “no” to question five, which asked “Did Econo-Rail comply with its
fiduciary duty to the Coal Logistics Group?” 
Question six was erroneously predicated on an affirmative answer to
question five, and the jury therefore left question six blank.

After the jury returned its verdict, Coal Logistics moved for
a mistrial, but did not object to the incomplete verdict before the jury was
discharged.  When the court stated it was
not going to grant a mistrial at that time, Coal Logistics accepted the jury=s verdict.  Coal Logistics therefore waived any benefit
from the jury question.  See Osterberg
v. Peca, 12 S.W.3d 31, 56 (Tex. 2000) (holding party, by failing to object
when jury did not return answer on attorney’s fees, waived any benefit from
jury question, waived any right to have trial judge supply his own fact finding
or grant new trial on the issue, and waived right to appeal judgment on issue
of attorney’s fees).  Thus, although Coal
Logistics tried its case on alternative theories of recovery and received favorable
liability findings on two of those, because the jury did not find damages on
the alternative theory, we are not required to examine the sufficiency of the
evidence on the second theory before reversing and rendering a take-nothing
judgment.  Cf. Boyce Iron Works v.
Southwestern Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988) (holding court
of appeals erred when it failed to consider party=s negligence claim after reversing
judgment on DTPA claim); Metro. Life Ins. Co. v. Haney, 987 S.W.2d 236,
244 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied) (considering negligence claim after reversing judgment on DTPA claim).

CONCLUSION








Because we sustain Econo-Rail=s issue one and because there are no
damages findings on Coal Logistics’s breach-of-fiduciary-duty claim, we reverse
and render judgment that Coal Logistics take nothing.  Given our resolution of Econo-Rail’s issue
one, we need not decide Econo-Rail=s remaining issues or the Coal
Logistic Group=s sole issue.

 

 

 

/s/        Wanda McKee Fowler

Justice

 

 

 

Judgment rendered
and Opinion filed July 25, 2002.

Panel consists of
Chief Justice Brister and Justices Fowler and Frost.

Do Not Publish C Tex.
R. App. P. 47.3(b).











[1]  The final
judgment is not against Floating Bulk Terminal, L.L.C.  Nevertheless, it joined with Econo-Rail on
the notice of appeal.  Appellee J.
Patrick Dowd worked for Coal Logistics, a family-owned shipping business.  Appellee Lillian Moore Dowd contributed a
share to the down payment on the ship.





[2]  BBT
subsequently merged with Econo-Rail.





[3]  The judgment
also recites, A[T]he October 7, 2000 Order Granting Equitable Relief
is hereby vacated based on Plaintiffs=
election.@





[4]  In
issue four, Econo-Rail challenges the jury=s
findings on breach of fiduciary duty. 
Econo-Rail apparently raises the issue because, in its election of the
breach-of-contract damages, Coal Logistics stated it was not Awaiving
Plaintiffs= right to seek
recovery on the alternative jury finding on breach of fiduciary duty.@  We address
breach of fiduciary duty only briefly to explain why that cause of action does
not support  recovery.





[5]  Coal Logistics
argues Econo-Rail’s “true complaint is that the charge contained an improper
question or questions regarding whether the parties created a legally
enforceable agreement.”  Based on our
reading of Econo-Rail=s brief and its argument in the trial court, we
disagree.  Econo-Rail is raising a no
evidence issue.





[6]  For cases in
which courts have held a contract unenforceable for failure of an essential
term see the following:  T.O. Stanley
Boot Co., 847 S.W.2d at 221B22
(holding alleged contract to make $500,000 line of credit available failed for
indefiniteness when no evidence was introduced regarding interest rate of
alleged loan or repayment terms); Gerdes v. Mustang
Exploration,
666 S.W.2d 640, 644 (Tex. App.CCorpus
Christi 1984, no writ) (holding contract for sale of water, which did not
specify price, was unenforceable because price of water was essence of
contract); Bridewell v. Pritchett, 562 S.W.2d 956, 958 (Tex. Civ. App.CFort
Worth 1978, writ ref=d n.r.e.)
(holding contract unenforceable because rate of interest to be paid by
subpurchaser to vendors on oral contract to effect cancellation of attempt to
foreclose on deed of trust and purchase‑money note was of the essence and
was not Adetail@
to be supplied by court); Terrell v. Nelson Puett Mortgage Co., 511
S.W.2d 366, 369 (Tex. Civ. App.CAustin
1974, writ ref=d n.r.e.)
(holding promise lacked definiteness of essential element, i.e., the
total sum to be underwritten during a period of six years).