Opinion issued December 15, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00604-CV

———————————

Stephen Davis, Appellant

V.

Stasha
Sampson, Appellee



 



 

On Appeal from the 280th District Court

Harris County, Texas



Trial Court Case No. 1012890

 



 

MEMORANDUM OPINION

          Appellant
Stephen Davis appeals from the entry of a protective order for the benefit of
Stasha Sampson.  See Tex. Fam. Code Ann. § 85.001 (West 2008).  Davis argues that the trial court erred by
denying his special appearance and that the evidence was legally and factually
insufficient to support the protective order. 
We affirm.

Background

Davis and Sampson had an intermittent
relationship that began in 2005 in Atlanta, Georgia.  In December 2006, they had a son.  Four months later, while living together in
Atlanta, they had an argument relating to Davis’s other son.  Sampson testified that Davis slapped her face
in front of the child.  After she hit him
back, Davis slapped her so hard that she fell off the bed where she had been
sitting.  Davis denied hitting Sampson,
testifying instead that Sampson swung at him.

Another eight months later, Sampson
decided to move out of their shared apartment.  When she went to gather her belongings, an
argument ensued and Davis hit her chin with his open hand, leaving a cut inside
her mouth.  When she threatened to call
the police, Davis said, “I don’t give a f— about the police.  Do you think I
care about the police?”  Sampson
testified that Davis shoved her into a walk-in closet, bruising her arm.  She later moved out.

Sampson later moved to Oklahoma,
though she testified that she and Davis remained involved “emotionally and
intimately.”  According to Sampson, she
returned to Atlanta frequently, as the couple divided their son’s time between
them.  In contrast, Davis testified that their
son lived primarily with him in Atlanta and that Sampson visited the child
there.  Several months after moving to
Oklahoma, in February 2009, Sampson moved to Houston with her son.  She testified that her son subsequently spent
time in both Atlanta and Houston.

Sampson testified that she had a
phone conversation with Davis on February 17, 2010, in which he threatened
her.  According to Sampson, Davis told
her that he had hired a private investigator to watch her for the past year,
and he confronted her about her relationship with another man.  Sampson testified that Davis told her that he
“was driving on I-10 from Atlanta on his way to Houston with a loaded .45 under
his seat and an extra clip.”  She also said
that Davis threatened to bring 15 armed men with him.  Throughout the same day, Davis sent her
approximately 20 threatening text messages.

Sampson read some of the text
messages into the record and testified that she felt threatened and immediately
feared for her life.  Some of these text
messages, which were sent between approximately 8:15 p.m. and 10:40 p.m., said:

Stash, I’m getting farther and
farther from the A ain’t gone b no turnin round in a minute u lock us into this
sh— aint no coming out till somebody f—ed up

 

I’m on the road stash the more
u dont pick up the madder you make me u can only keep him from me so long you
about to destroy all the little sh—
u done worked 4

 

You asked for this stash.  When I get out there its gone be too late to
start himin and hawin.  I keep telling
u.  u dont want no problems from me but
ima show u.

 

your motherf—ing guard.  You
better tell that f— n— to come see about you.  I’m going to teach your little retarded ass.

 

Yeah, just called that f— n— too.  His ho ass aint answered.  All yall . . . .

 

I’m letting you know right now
from now on the streets ain’t safe.  watch
ya self at all times.  u f— piece of shit. 
Goddamn u got it coming.

 

F— it.  Let’s do it.  See you when I see you n—.  Have 

 

Tell my baby goodnight.  And you watch ya self.  F—ing
whore.

 

From here on out, we
enemies.  You better kill me.

 

Uh uh.  Don’t sleep. 
I’m coming baby.  no mo sleep for
you.  

 

Thought about it tho. 
You prob want somebody to put you retarded ass outa your misery.  Being at CC house and gone save u neither.  Just gone get her sh— f’ed up.

 

C. Martin, Sampson’s friend,
testified that Davis called her twice during the day on February 17, 2010.  Martin said that Davis belittled Sampson,
accused her of sleeping with another man, and said that he had engaged a
private investigator to follow Sampson in Houston.  Martin also testified that Davis threatened
that Sampson would not “live to see her next birthday,” and that “he was
willing to die to go to jail—go to prison for his respect and she disrespected
him.”  She believed that Davis was going
to “come do something” to Sampson, but that he was choosing his words
carefully.  She also saw text messages
from Davis on Sampson’s phone in which he threatened to kill Martin before
killing Sampson.  Later, when Martin was
in the car with Sampson, Davis called Sampson. 
Sampson held the phone up so that Martin could hear, and he told Sampson
that he had called Martin “to ask her how her best friend wanted to die.  Did she want to get her head chopped off or
did she want to get shot in her face.” 
Martin said she took Davis’s statements as threats and believed that he
was capable of following through on them.

Sampson testified that Davis did
not communicate with her directly after February 17, 2010, but she alleged that
his other son’s mother came to Houston and harassed and threatened her on his
behalf.

Davis testified at the hearing on
the protective order.  He said that he
had never been to Texas before and that he was in Texas to testify at the
hearing and to turn himself in on a criminal warrant.  He denied ever threatening to harm Sampson in
any manner.  He denied ever being
physically violent with Sampson.  He also
denied owning a .45-caliber gun.  Davis
testified that Sampson had lied to him, had been involved with illegal drugs,
and had been irresponsible with their child.

Davis testified that the phone
number from which the text messages were sent was not his personal mobile phone
number.  He, his mother, and the mother
of his older son all testified that the threatening messages came from a phone
that was used as a “house phone” at their home in Atlanta.  They said that all household members had
access to that phone, including a cousin who was asked to leave the house
because of her disruptive behavior.  The
mother of Davis’s older son testified that the cousin was using the phone “most
of the day” that Sampson received the threatening text messages.

Davis described a complicated and
contentious relationship with Sampson, but he said his two sons got along well.  Davis said that he asked the mother of his
older son to bring him to Houston to spend several days a week at the same day
care with his brother because the older son missed him.

Davis admitted to prior convictions
for trespassing and disorderly conduct. 
At the time of trial on the protective order, Davis had been charged with
terroristic threat and verbal harassment related to the threats communicated to
Sampson.  He had been communicating with
the private investigator in Houston regarding the protective order. 

          Davis
filed a special appearance, but he did not obtain a ruling on it before
testifying at the hearing on the protective order.  After the hearing, the trial court granted
the protective order as to Sampson, but not as to their son.

Analysis

I.                 
Special appearance

In his first issue, Davis contends
that the trial court erred in denying his special appearance because Sampson
did not plead specific facts sufficient to show a connection with the State of
Texas.  In the alternative, Davis
contends that if Sampson’s jurisdictional pleadings were sufficient, then the
alleged phone calls and text messages are an insufficient basis for jurisdiction
because his actions took place in Atlanta, Georgia.

A party may challenge personal
jurisdiction by filing a special appearance.  Tex. R.
Civ. P. 120a; see Kawasaki Steel
Corp. v. Middleton, 699 S.W.2d 199, 201 (Tex. 1985).  But a special appearance is waived by
participation in the trial.  See Tex.
R. Civ. P. 120a(1) (“Every appearance, prior to judgment, not in
compliance with this rule is a general appearance.”); Milacron Inc. v. Performance Rail Tie, L.P., 262 S.W.3d 872, 875
(Tex. App.—Texarkana 2008, no pet.); see
also Exito Elecs. Co., Ltd. v. Trejo, 142 S.W.3d 302, 304 (Tex. 2004) (“[A]
party enters a general appearance when it (1) invokes the judgment of the court
on any question other than the court’s jurisdiction, (2) recognizes by its acts
that an action is properly pending, or (3) seeks affirmative action from the
court.”).  “A specially appearing
defendant may not go to trial on the merits of the case without first obtaining
a ruling on his special appearance.” Milacron,
262 S.W.3d at 875.  “For this reason,
Rule 120a requires that the specially appearing defendant timely request a
hearing, specifically bring that request to the trial court’s attention, and
secure a ruling on the preliminary question of personal jurisdiction.”  Id.
at 875–76 (citing Tex. R. Civ. P. 120a).

Davis filed a special appearance,
but the record does not reflect any ruling on the special appearance.  Davis contends that the lack of a record
showing the trial court’s denial of his special appearance is not fatal to his
complaint on appeal, relying on Michiana
Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 782–84 (Tex.
2005).  That case is inapposite.  There was no issue in Michiana about whether the trial court actually had denied the
special appearance, see Michiana, 168 S.W.3d at 781, and the
error-preservation issue addressed by the Texas Supreme Court related to the
failure to obtain a record of the non-evidentiary special-appearance hearing, see id. at 781–84.  Thus, because the record does not reflect
that Davis obtained a ruling on his special appearance before he appeared and
testified at trial, his jurisdictional objection is waived.  See Tex. R. Civ. P. 120a; Milacron, 262 S.W.3d at 876.  We therefore hold that he has waived his first
issue on appeal. 

II.              
Sufficiency of the evidence

Davis challenges the legal and
factual sufficiency of the evidence to support the entry of the protective
order.  A court shall render a protective
order if the court finds that family violence has occurred and is likely to
occur in the future.  Tex. Fam. Code Ann. §§ 81.001,
85.001 (West 2008).  “Family violence” is
defined, in pertinent part, as

[A]n act by a member of a
family . . . against another member of the family . . . that is intended to
result in physical harm, bodily injury, assault, or sexual assault or that is a
threat that reasonably places the member in fear of imminent physical harm,
bodily injury, assault, or sexual assault, but does not include defensive
measures to protect oneself.



Id. § 71.004(1).  “Family” is defined
to include individuals who are parents of the same child.  Id.
§ 71.003.  In his second, third, and
fourth issues, Davis contends that the evidence was inadequate to show that
family violence occurred or was likely to occur in the future.

When the trial court acts as a fact
finder, we review its findings under the legal and factual sufficiency
standards.  In re Doe, 19 S.W.3d 249, 253 (Tex. 2000); Vongontard v. Tippit, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st
Dist.] 2004, no pet.).  When a party who
does not have the burden of proof at trial challenges the legal sufficiency of
the evidence, we consider all of the evidence in the light most favorable to
the prevailing party, indulging every reasonable inference in that party’s
favor and disregarding contrary evidence unless a reasonable fact finder could
not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005); City of Houston v. Hildebrandt, 265 S.W.3d 22, 27 (Tex.
App.—Houston [1st Dist.] 2008, pet. denied) (citing Assoc. Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276,
285–86 (Tex. 1998)).  “If there is any
evidence of probative force to support the finding, i.e., more than a mere
scintilla, we will overrule the issue.”  Hildebrandt, 265 S.W.3d at 27 (citing Haggar Clothing Co. v. Hernandez, 164
S.W.3d 386, 388 (Tex. 2005)).

In reviewing a factual sufficiency
challenge, we examine the entire record and consider and weigh all the
evidence, both in support of, and contrary to, the challenged finding.  See
Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Vongontard, 137 S.W.3d at 112. 
Having considered and weighed all the evidence, we should set aside the
verdict only if the evidence is so weak, or the finding is so against the great
weight and preponderance of the evidence, that it is clearly wrong and
unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  We cannot merely substitute our opinion for
that of the trier of fact and determine that we would reach a different
conclusion.  Hollander v. Capon, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st
Dist.] 1993, writ denied).

A.              
Past
family violence

Davis contends that there was no
evidence or factually insufficient evidence of past family violence.  In his second issue he contends there was
insufficient evidence of an “imminent” threat. 
The term “imminent” in Family Code Section 71.004 refers to a present
threat, not a threat of future bodily injury or death.  See
Robertson v. State, 175 S.W.3d 359, 362 (Tex. App.—Houston [1st Dist.]
2004, pet. ref’d) (citing Devine v. State,
786 S.W.2d 268, 270 (Tex. Crim. App. 1989)). 
“Imminent” means “near at hand; mediate rather than immediate; close
rather than touching; impending; on the point of happening; threatening;
menacing; perilous.”  Devine, 786 S.W.2d at 270 (quoting Black’s Law Dictionary 676 (5th ed.
1979)).

Davis argues that the threats were
not imminent because he was in Atlanta and Sampson was in Houston at the time
the text messages were sent and the phone calls were placed.  The inquiry, however, is whether the threats
reasonably made Sampson fear imminent physical harm.  See
Tex. Fam. Code Ann. § 71.004(1).  Although Davis testified that he was in
Atlanta, the text messages indicated that he had left Atlanta.  For example, he wrote, “I’m getting farther
and farther from the A,” “I’m on the road,” and “When I get out there[,] it’s
gone [sic] be too late to start himin and hawin [sic].”  These text messages were sent between
approximately 8:30 p.m. and 10:45 p.m., and they indicated that Davis was
traveling from Atlanta to Houston.  He
also sent a text message saying she should watch herself “at all times,” and
not sleep, “no mo sleep for you.”  These
text messages reasonably could be understood to threaten imminent physical harm
because it was near at hand or about to happen. 
See Devine, 786 S.W.2d at 270. 

In addition, Davis argues that the
evidence reflected that Sampson believed he was in Atlanta on the day the
threats were made.  This argument
mischaracterizes the record because Sampson’s testimony to that effect was made
in specific reference to Davis’s whereabouts at 7:30 a.m. on February 17,
2010.  She received the threatening text
messages between approximately 8:30 p.m. and 10:45 p.m. that night, and she testified
that as she received the messages in Houston, she feared for her life.  The text messages indicated that Davis was on
his way to Houston and that he intended to harm her, just as he had threatened
in his phone calls the same day.  In the
context of the record, a reasonable fact finder could have believed that Sampson’s
earlier statement that she thought Davis was in Atlanta pertained only to the
morning and did not contradict her testimony that she feared for her life when
she received the text messages that night.

Viewing the evidence in the light
most favorable to the verdict, we conclude that there is some evidence of
probative force to support the trial court’s ruling pertaining to the imminence
of the threat.  See Hildebrandt, 265 S.W.3d at 27. 
Viewing the evidence favorable and contrary to the court’s ruling, we
conclude evidence is not so weak, nor is the finding so against the great
weight and preponderance of the evidence, that it is clearly wrong and
unjust.  See Cain, 709 S.W.2d at 176.  We hold that the evidence is legally and
factually sufficient to show that the threatened harm was imminent, and we
overrule Davis’s second issue.  Because
we conclude that the evidence of Davis’s threats was sufficient to establish
that family violence had occurred, see
Tex. Fam. Code Ann.
§§ 81.001, 85.001, we need not address Davis’s third issue, which challenges
the sufficiency of the evidence of other past physical acts of family violence
that occurred in Atlanta.

B.              
Future
family violence

          In
his fourth issue, Davis challenges the sufficiency of the evidence to support
the trial court’s finding that he was likely to commit future acts of family
violence.  His sole argument, that past
violence will not support an inference of a likelihood of future violence
absent a “long-standing history of family violence,” is unavailing.  “The statutory language of Title IV does not
require that a likelihood finding be based on more than one act of family
violence.”  Boyd v. Palmore, No. 01–10–00515–CV, 2011 WL 4500825, at *5
(Tex. App.—Houston [1st Dist.] Sept. 29, 2011, no pet. h.) (citing Tex. Fam. Code Ann. §§ 81.001, 85.001).
 “On the contrary, courts have recognized
that ‘[o]ftentimes, past is prologue; therefore, past violent conduct can be
competent evidence which is legally and factually sufficient to sustain the
award of a protective order.’”  Id. (quoting In re Epperson, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no
pet.); accord Banargent v. Brent, No.
14–05–00574–CV, 2006 WL 462268, at *1–2 (Tex. App.—Houston [14th Dist.] Feb.
28, 2006, no pet.) (mem. op.).  Under
this principle, Sampson’s testimony about Davis’s prior acts of family violence,
including the threatening and future-looking nature of his threats, supports a
finding that he was likely to commit such acts in the future.  See id.

Viewing the evidence in the light
most favorable to the verdict, we conclude that there is some evidence of
probative force to support the trial court’s rulings pertaining to past and
future acts of family violence.  See Hildebrandt, 265 S.W.3d at 27.  Viewing the evidence favorable and contrary
to the court’s rulings on past and future family violence, we conclude evidence
is not so weak, nor is the finding so against the great weight and preponderance
of the evidence, that these rulings are clearly wrong and unjust.  See
Cain, 709 S.W.2d at 176.  We hold
that the evidence is legally and factually sufficient to show that Davis
committed past acts of family violence and was likely to commit such acts in
the future, and we overrule his third and fourth issues.

Conclusion

          We
affirm the order of the trial court.

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and
Massengale.